**Gad DOREUS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 06–CF–247.**

District of Columbia Court of Appeals.

Argued Feb. 27, 2008.
Decided Jan. 29, 2009.

Richard S. Stolker, Rockville, MD, appointed by the court, for appellant.

Mary Chris Dobbie, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III and Opher Shweiki, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

A jury found appellant, Gad Doreus, guilty of possession of a controlled substance with intent to distribute (cocaine) while armed.[1] He challenges his conviction on the ground that the trial court violated (1) his constitutional Sixth Amendment confrontation right by admitting the Drug Enforcement Administration ("DEA") chemist's report over his objection and without ordering the government to make the chemist available for cross-examination, and (2) his constitutional Fourth and Fifth Amendment rights by denying his motion to suppress physical and identifica- tion evidence. In addition, he contends that the government presented insufficient evidence to satisfy the "while armed" penalty enhancement factor. We vacate the trial court's judgment and remand this case for a new trial.

## FACTUAL SUMMARY

During a hearing on Mr. Doreus's motion to suppress physical and identification evidence, the government presented the testimony of Metropolitan Police Department ("MPD") Officers Carole Turner and Eric Fenton. Officer Turner, a fifteen-year veteran with five years experience in narcotics and 300 to 400 drug buys while working undercover, was part of an April 14, 2005 "buy/bust operation" on Keefer Place, a high drug area, in the Northwest quadrant of the District of Columbia. Two other officers were with Officer Turner in an unmarked vehicle, Officers Darrick Wallace and Denise Roy. The officers saw a man, later identified as Mr. Doreus, standing on the street with other people; they stopped their vehicle and observed the scene. Soon a white car pulled in front of the officers' vehicle, and a female exited, approached Mr. Doreus and spoke with him for about a minute. Mr. Doreus left the woman and headed for a house in the 600 block of Keefer Place. Upon arriving at a house, he walked "behind the bushes" and down some basement steps, "picked up something, then put it back down." Officer Turner could not see what he retrieved and "didn't see anything in his hands." He returned to the female, gave her "something," ("a small object") and she in turn "gave him something back." Based on her experience, Officer Turner believed she had witnessed a "hand-to-hand" narcotics transaction.

---

1. *See* D.C.Code §§ 48–904.01(a)(1), 22–4502 (2001).

Soon after the transaction, Officer Wallace broadcasted a lookout for the female, and for Mr. Doreus who was described as a "black male with a white T-shirt, black hat and blue pants." The arrest team, Officers Fenton, Jeffrey Bruce, and James Greene, received the broadcast. Within "five or six minutes," the arrest team officers saw Mr. Doreus whom Officer Fenton described as "a perfect match," at the corner of 6th and Keefer Place. They stopped him, placed him in handcuffs and took him "10 to 15 feet" down the block for a show up identification. When the undercover officers drove by and looked at Mr. Doreus, they identified him as the man who had engaged in the transaction with the female; the female was never found. Officer Fenton stated that Officer Greene searched the area around the house where the undercover officers had seen Mr. Doreus bend down to retrieve something. In a brick area, he discovered a drain, lifted it up and saw a piece of plastic "like a sandwich bag that contained ... five white tablets, which were individually packaged in zip-lock bags, and also ... 32 zip-lock bags containing white rock substance which later field tested positive for cocaine...." Mr. Doreus was arrested after Officer Greene told other officers what he had found. MPD Officer Durriyyah Habeebullah conducted a search incident to arrest, which revealed $31.00 and a hand knife on Mr. Doreus's person.

The trial judge denied Mr. Doreus's suppression motion, and the case proceeded to trial. The government presented as its witnesses Officers Wallace, Bruce, Greene, and MPD Officer Wayne Knox. Officer Knox, who had no personal knowledge of the incident involving Mr. Doreus and who had not visited the crime scene, testified as

an expert on drug-related matters, including "the use, the pricing, packaging and distribution techniques for the street-level sale of controlled substances," as well as MPD and DEA "procedures ... to safeguard the integrity of suspected drug evidence." He stated that the market value of each of the small zip-lock bags containing a cocaine base substance (80 to 150 milligrams per bag) was around $20.00.[2] On cross-examination, Officer Knox agreed that "a typical street user would buy two or three bags."

The other officers essentially recounted the events that unfolded on the evening of April 14, 2005. Officer Wallace described his observations of the female on the street and Mr. Doreus's actions, indicating that he saw Mr. Doreus go to the basement area of the Keefer Place residence, "fumbl[e]" with some small objects, after which he returned to the female on the streets and handed her an object for which he received something in return; based on his experience, he "believed" the female gave Mr. Doreus "U.S. currency." Officer Greene described in detail his recovery of the items from the drain or downspout, located under the porch of a house in the 600 block of Keefer Place; no other officer was present during the recovery of the drugs. One item which Officer Greene removed from the downspout consisted of a plastic bag containing five zip-lock bags, with a total of five white pills. He also discovered "a clear zip-lock bag, which contained a total of 32 smaller zip-lock bags of a rock-like substance." Officer Greene did not mention conducting a field test (Officer Fenton referenced field testing during his testimony), and apparently none was done.[3] Rather, he placed what

2. The thirty-two zip-lock bags contained a total of 3.0 grams of cocaine base, and the estimated sale of thirty bags would result in $600.00.

3. Officer Greene testified that he "never performed a field-test" on the zip-lock bags containing the white tablets and fragments of tablets. Officer Knox acknowledged that the

he had removed from the drain into a zip-lock bag, put the bag in his vest pocket, took it "back to the major narcotics branch," "prepared the heat-seal, DEA-7 [form], and PD form 81," and after Officer Bruce dusted the zip-lock bags for fingerprints, Officer Greene retrieved the package with the PD form 95 which he also had completed, and dropped it in the property control box.

Officer Bruce added details about the knife found on Mr. Doreus during the search. He removed "[a] folding knife" which had been "clipped" to Mr. Doreus's waistband, with "the blade and the casing" inside his pants and "the ... clip was facing out"; the blade of the knife was "approximately four inches" and the "overall length ... about eight and three-quarters." In addition to the testimonial evidence, the government introduced the DEA chemist's report but did not make the chemist available for cross-examination.[4]

## ANALYSIS

■ Mr. Doreus contends that his constitutional Sixth Amendment confrontation right was violated because, despite his objection, "[t]he [DEA] chemist whose analysis and findings were critical to the

DEA chemist's report revealed that the white tablets and fragments did not consist of any controlled substance; they contained caffeine and dextromethorphan, which are "stimulants," "analgesics."

4. Mr. Doreus called three witnesses in his defense: (1) Officer Turner to establish testimony she gave during the suppression hearing, that she was the driver of the undercover vehicle, was not true; (2) Audrey Tryst in an effort to present an alibi defense by showing that she was with Mr. Doreus on the afternoon and early evening of April 14, 2005; and (3) Ruth Wells to indicate that Mr. Doreus was in her presence or running errands for her between 6:00 p.m. and 6:45 p.m. on April 14, 2005.

government's proof that the substance purportedly seized from [him] contained a controlled narcotic [cocaine], never testified at trial nor otherwise was made available to the defense for cross-examination." The government acknowledges that Mr. Doreus's conviction for possession of a controlled substance (cocaine) with intent to distribute must be vacated (1) in light of our decisions in *Howard v. United States*, 929 A.2d 839 (D.C.2007) and *Thomas v. United States*, 914 A.2d 1 (D.C.2006), (2) given defense counsel's objection to the introduction of the DEA chemist's report, and (3) because no other direct evidence was introduced to prove that the substance seized by the police officers constituted cocaine. Nevertheless, the government contends that it "would be entitled either to re-try appellant or, alternatively, to seek entry of judgment on a lesser-included offense."[5]

In *Fields v. United States*, 952 A.2d 859 (D.C.2008), we confronted a somewhat similar factual situation, except that the controlled substance involved there was marijuana instead of cocaine and the circumstantial evidence was weaker with respect to a reasonable inference concerning appellant's attempt to possess a controlled substance with the intent to distribute it.[6]

5. The trial court did not instruct the jury on the lesser-included attempt offense.

6. In *Fields*, the police saw appellant leaning over a car talking to the occupants in a drug activity area. Appellant walked away as soon as he saw the police, and ran when the police exited the police car. Here, officers on a buy/bust operation saw appellant standing on the street, observed a car pull up and watched as a female got out and approached appellant and then saw appellant walk over to what could be inferred as a drug stash, appellant retrieved something and returned to exchange something with the female.

As here, the government maintained that it was entitled to a remand and entry of judgment on the lesser-included offense of attempted possession under D.C.Code § 48–904.09 (2001). *Id.* at 859. We disagreed, "conclud[ing] that ... the erroneous admission of the DEA–7 report without an opportunity to cross-examine the chemist who prepared it was not harmless beyond a reasonable doubt as to the offense of attempted possession of marijuana because we cannot say that the error did not contribute to the verdict, and the government did not otherwise present overwhelming evidence that appellant intended to possess marijuana." *Id.* at 869. Although we have held that to prove attempted possession the government need not prove that the substance is the same as that charged in the greater offense of possession with intent to distribute, *see Thompson v. United States*, 678 A.2d 24, 27 (D.C.1996), we nevertheless said in *Fields:*

> For attempted possession, "[t]he government must establish conduct by the defendant that is reasonably adapted to the accomplishment of the crime of possession of the proscribed substance, and *the requisite criminal intent.*" *Seeney [v. United States]*, 563 A.2d [1081], 1083 [D.C.1989] (emphasis added). The *mens rea* element requires proof that appellant had the "intent to commit the crime[ ]" of attempted possession of a controlled substance (in this case, marijuana). *Blackledge v. United States*, 447 A.2d 46, 48 (D.C.1982). Here, the fact of actual possession was sought to be proven by the officer's testimony that the green weed substance fell on the floor from appellant's clothes, and that a plastic bag with a similar substance was found close to appellant in the holding cell. The same evidence would serve to prove attempted possession. The DEA–7 report was offered as proof that *what*

appellant possessed was marijuana. *See Thomas*, 914 A.2d at 22.... If the case had been charged and tried for attempted possession, the DEA–7 report similarly would prove that what appellant intended to possess was a controlled substance, marijuana.

952 A.2d at 865.

In this case the government relied on (1) testimony by Officer Turner (at the suppression hearing) and Officer Wallace (at trial) who did not see what Mr. Doreus gave to the unidentified woman and what he received in return, (2) testimony of Officer Greene who later found thirty-two zip lock bags containing a white rock substance in the area where the observation team had seen Mr. Doreus bend down, retrieve something, and put something back, and (3) the DEA chemist's report showing that the zip lock bags containing the white rock-like substance, recovered by Officer Greene, consisted of cocaine. Had Mr. Doreus been charged only with the lesser-included attempted possession offense, the government undoubtedly would rely on the same testimony it presented in this case. While the government's evidence aside from the DEA–7 report, suggested a reasonable inference of Mr. Doreus's involvement with drugs, we are not convinced that based on the circumstantial evidence alone, reasonable jurors would have found the requisite intent for entry of judgment on the lesser-included attempt offense, or that they would have found beyond a reasonable doubt that the government proved attempted possession with intent to distribute a controlled substance.

First, the observation officers were able to give only limited testimony as to what they were able to see. While they witnessed a two-way exchange, Officer Turner could not see what Mr. Doreus retrieved from the drain at the Keefer Place

residence, and "didn't see anything in [his] hands" when he emerged from the basement steps. In terms of the actual exchange, the most Officer Turner could say during the suppression hearing was that Mr. Doreus gave the female on the street "something" or "a small object" and the female "gave [Mr. Doreus] something back." At trial, Officer Wallace was a bit more specific, testifying that he saw Mr. Doreus "pouring something in his hand, from the basement area," then "[h]e approached the female, at which time he handed her an object. And she then handed him something in return." When asked what led him to believe that a narcotics transaction had occurred, Officer Wallace responded, in part, that after Mr. Doreus gave the female "an object, . . . she handed him what [he] believed to be an undetermined amount of U.S. currency." On cross-examination, Officer Wallace admitted that he had discussed the case recently with Officer Turner, and that he made no notes contemporaneous with the incident involving Mr. Doreus. Officer Wallace also stated that "he couldn't see exactly what [Mr. Doreus] had in his hand," but that he saw him "fumbling with some small objects . . . in that basement area." He further said he "didn't see the green money . . . per se," but he "believed" the female gave Mr. Doreus "U.S. currency."

In *Shelton v. United States,* 929 A.2d 420 (D.C.2007), an unlawful possession drug case, we determined that even more detailed police officer observations of a suspect believed to be engaged in a narcotics transaction were insufficient to establish probable cause for an arrest, even though the officer witnessed:

> (1) appellant sitting in a car in a convenience store parking lot, (2) a pedestrian holding currency approach appellant's driver's side window and give that money to appellant, (3) the pedestrian receive back from appellant some kind of

"small object," and (4) both parties depart the scene.

929 A.2d at 424. If these observations in a two-way exchange case fell short of a probable cause determination, we would be hard pressed to conclude that the observation officers' testimony in this case would be compelling evidence leading, in part, to a basis for Mr. Doreus's conviction on the lesser-included attempt offense. Cases where we have sustained drug convictions, based in part on the observations of police officers reveal more details and include: (1) *Peterkin v. United States,* 281 A.2d 567 (D.C.1971) where an officer saw a plastic vial (in which drugs were known to be transported) exchanged for $2 in cash; *Tobias v. United States,* 375 A.2d 491, 494 (D.C.1977), where the police viewed appellant removing a small object from a shoulder bag and watched him receive currency from a buyer; *Coles v. United States,* 682 A.2d 167, 168 (D.C.1996), where an officer noticed an exchange of a zip-lock bag retrieved from a tree box stash for currency; and *Thompson v. United States,* 745 A.2d 308, 314 (D.C.2000), where the officers observed the appellant for about twenty minutes as he sat on a porch at night on a cold January day, leaving the porch twice to meet the occupants of two different cars and to take them to an alley where he reached down, and handed the individuals an object in exchange for currency.

Second, in cases where we have sustained drug convictions, expert testimony has been important. Here the government presented important expert testimony concerning "pricing, packaging and distribution techniques for the street-level sale of controlled substances," but at least one aspect of that testimony could plant seeds of reasonable doubt as to whether Mr. Doreus had the requisite intent to distribute a controlled substance, even in an attempt case. Officer Knox, the govern-

ment's expert, testified that each of the thirty-two zip-lock bags recovered from the downspout at the Keefer Place residence and which contained a cocaine base substance, had a market value of $20.00 and the general practice of a street purchaser was to buy two or three of these bags. Yet, when Officer Habeebullah conducted his search of Mr. Doreus, he found only $31.00 in currency on his person, and there was no testimony that Mr. Doreus was working with a partner, or that he furtively tried to conceal anything that was on his person.

Third, tests of the drugs recovered in other cases all tend to reveal controlled substances. Here, Officer Greene pulled from the downspout not only the thirty-two zip-lock bags containing cocaine base, but also five zip-lock bags with white tablets or fragments of tablets. Testing revealed that these tablets were not controlled substances, but stimulants or analgesics. Given the possibility that Mr. Doreus may have given the female a white tablet or a fragment, reasonable jurors could conclude that the government could not meet the "beyond a reasonable doubt standard" for an attempt conviction when faced with the knowledge that the government must establish the requisite intent to distribute a controlled substance.

Fourth, we are not persuaded that the cases cited by the government show that, on this record, it is entitled to entry of judgment on the lesser-included attempt offense. *Samson v. United States*, 692 A.2d 437 (D.C.1997) is instructive. There, we reversed a conviction for possession with intent to distribute marijuana and remanded the case for a retrial on that charge, or for entry of judgment on the lesser-included offense of possession of narcotics, at the government's election. But that case is different—the evidence supporting the lesser-included offense was stronger, and we stated that despite the fatal instructional error, there was sufficient evidence to support a verdict on the greater offense. In that case, an undercover officer purchased marijuana inside an apartment, and two days later a search warrant was executed at the same apartment. Appellant was inside the apartment and the police found additional marijuana. *Willis v. United States*, 692 A.2d 1380 (D.C.1997) was not a drug case. In addition, we were able to say that "the lesser included offense of ADW was not affected by the error causing reversal." *Id.* at 1383. On this record we are not confident that the lesser-included attempt offense would not have been affected by the DEA–7 chemist's report.

■■ Hence, for the foregoing reasons we cannot say under the harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that the government would have been able to satisfy its high burden of proof beyond a reasonable doubt with respect to establishing the requisite intent for an attempted possession with intent to distribute a controlled substance offense. Accordingly, we cannot agree with the government that it is entitled to entry of judgment on the lesser-included offense; we vacate the trial court's judgment and remand this case for a new trial on the charge of possession with intent to distribute a controlled substance (cocaine) while armed.[7]

*So ordered.*

---

7. With respect to Mr. Doreus's suppression arguments, our review of the record satisfies us that the trial court properly denied Mr. Doreus's motion to suppress evidence. Based on the evidence presented the veteran police officers, with substantial experience in narcotics, had a reasonable, articulable suspicion (not merely a hunch) that Mr. Doreus was

GLICKMAN, Associate Judge, concurring in the result:

I write separately to explain why I conclude that, without the DEA chemist's report, a rational jury could have had a reasonable doubt that appellant committed the lesser-included offense of *attempting* to possess a controlled substance with intent to distribute it. The question is a close one, for even without the chemist's report, there was quite strong evidence that appellant intended to exercise dominion and control over a secret cache of drugs for purposes of distribution. In brief, the police saw appellant retrieve a small item from a basement stairwell for a hurried hand-to-hand exchange on the street with a fleeting customer. When the police inspected the stairwell, they found 32 small zip-lock bags containing a white rock-like substance (plus five bags containing one pill each) concealed inside a gutter down spout. A police detective testified that, in his expert opinion, the quantity and packaging of the suspected drugs indicated that appellant held them for distribution rather than personal use. What the police witnessed had all the hallmarks of a typical street-level drug transaction, and to convict appellant of the lesser-included attempt offense, the government was not required to prove that the white rock substance actually was cocaine (or, indeed, that it was contraband of any kind).[8]

Nonetheless, the *mens rea* element of the attempt offense required the government to prove that appellant intended to possess a controlled substance for purposes of sale.[9] With respect to that element, as we recognized in *Fields*, "the jury could well have had a doubt about the government's case if the prosecution did not proffer the type of scientific evidence establishing the identity of the [putative drugs] that is commonly expected."[10] The government's unexplained failure to prove that there was some type of controlled substance in the zip-lock bags seized by the police might have fueled a suspicion that appellant only possessed, and only intended to possess, fraudulent "burn bags"—bags containing a substance that appeared to be cocaine but that in reality was not contraband of any sort. This possibility might seem unduly speculative, but it was raised at trial, albeit obliquely, by the government's own expert witness. The witness, a police detective, testified that the average cocaine user purchases no more than two or three zip-lock bags at a time in order to reduce the risk of buying "what we call burn bags." All of the government's admissible evidence, including the fact that appellant stored his merchandise in a hidden stash, was consistent with

engaged in criminal activity, and the officers initiated a brief investigatory stop without arresting Mr. Doreus. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Hicks v. United States*, 730 A.2d 657 (D.C. 1999); *In re M.E.B.*, 638 A.2d 1123 (D.C. 1993). Furthermore, on this record, we conclude that the government presented sufficient evidence to justify imposition of the "while armed" enhancement penalty. The government's proof established that Mr. Doreus possessed a weapon, an eight and three-quarters inch knife with a four-inch blade. The folding knife was clipped to his waistband, under his control and ready to be used. Under the circumstances of this case, reason-

able jurors could conclude that Mr. Doreus possessed a dangerous or deadly weapon. *See Broadie v. United States*, 925 A.2d 605, 617 (D.C.2007); *Lewis v. United States*, 767 A.2d 219, 224 (D.C.2001); *Nelson v. United States*, 280 A.2d 531, 532–33 (D.C.1971) (per curiam).

8. *See Fields v. United States*, 952 A.2d 859, 864 (D.C.2008).

9. *Id.* at 865.

10. *Id.* at 867.

the "burn bag" hypothesis; to achieve verisimilitude, someone trying to defraud would-be buyers of cocaine would have every incentive to mimic the behavior of a dealer in the genuine article. At the close of trial, appellant's counsel could have argued forcefully that the government had not met its high burden of proof as to appellant's intent to possess a controlled substance when it had not even shown what the zip-lock bags contained.[11] This might have been a difficult argument to counter, for the prosecutor would have been unable to rule out the "burn bag" hypothesis or to explain the conspicuous gap in the government's proof. The unanswered questions might have loomed large in the jury's deliberations.

It is for these reasons that I think a rational jury not privy to the DEA chemist's report could have declined to find appellant guilty of attempted possession of a controlled substance. Hence I agree with my colleagues that the unconstitutional introduction of the chemist's report was not harmless beyond a reasonable doubt with respect to the lesser-included offense.[12]

11. I do not suggest, however, that appellant's counsel would have been allowed to make a "missing witness" argument based on the DEA chemist's absence. For one thing, the chemist was available "more or less equally" to both sides. *McPherson–Corder v. Chinkhota*, 835 A.2d 1081, 1086 (D.C.2003) (explaining that argument for adverse inference from absence of witness at trial is appropriate only when witness is "peculiarly available" to the opposing party).

12. *See Fields*, 952 A.2d at 862–64, 867.