Gualyn C. WILLIAMS and Melonee
Bryant, Appellants,

v.

UNITED STATES, Appellee.

Nos. 06–CF–1586, 06–CF–1587.

District of Columbia Court of Appeals.

Argued Dec. 12, 2008.
Decided Feb. 26, 2009.

Richard S. Stolker, Rockville, MD, for appellant Williams.

Christopher Kemmitt, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant Bryant.

J.P. Cooney, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Mary B. McCord, and Sharon K. Donovan, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, KRAMER, Associate Judge, and FARRELL, Senior Judge.[1]

FARRELL, Senior Judge:

A jury found both appellants guilty of distributing cocaine to an undercover police officer. On appeal, their primary argument (indeed, Williams' sole contention) is that the admission of a DEA–7 chemist's report identifying the recovered substance as cocaine, without corresponding testimony by the chemist, violated *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as applied in *How-*ard v. United States*, 929 A.2d 839 (D.C. 2007), and *Thomas v. United States*, 914 A.2d 1 (D.C.2006). The government concedes error on the point but argues that Williams has not preserved the error nor shown "plain error," *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), justifying reversal. As to Bryant, the government agrees that her distribution conviction must be reversed, but contends that the error in admitting the chemist's report was harmless as to the (implicitly tried) lesser-included offense of attempted distribution, which required no proof of the specific identity of the controlled substance. *See Thompson v. United States*, 678 A.2d 24, 27 (D.C. 1996).[2]

In light of *Howard* and *Thomas, supra,* we agree with the government's concession of error, but reject its argument of non-preservation as to Williams. On the other hand, we conclude that on the facts of this case the error in admitting the DEA–7 report was harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as to the included charge of attempted distribution, leaving the government free on remand to accept entry of convictions of each defendant for that crime. We reject Bryant's remaining claim for reversal.

## I.

MPD Officer Ellerbee, acting undercover, was approached on a street corner by a woman, appellant Bryant, who asked him "what's up" or "what's wrong?" When he replied that he was "trying to get some stones" (a common street name for crack

---

1. Judge Farrell was an Associate Judge, Retired at the time of argument. His status changed to Senior Judge on January 23, 2009.

2. Alternatively, the government makes the same argument of harmlessness as to Williams.

cocaine), Bryant told him she could "take him to it," and she led him to a nearby courtyard. As they walked, she instructed him that if anyone asked, he should say he was her cousin, and she gave him a fake "street name." Ellerbee gave Bryant $25 in pre-recorded police funds and asked her for "three for 25," knowing that drug dealers would often give a five dollar discount for three $10 bags of crack cocaine.

Bryant took the money and walked into the courtyard, approaching a man, appellant Williams, who was standing by a set of mailboxes. From his position at the edge of the courtyard, Ellerbee saw Bryant hand Williams the pre-recorded funds and receive something from him in return (a "hand-to-hand" exchange). Bryant then rejoined Ellerbee and, after they had walked away together, produced three ziplock bags of a white rock-like substance, giving him two and keeping one.[3] Leaving Bryant, Ellerbee returned to an unmarked police car where MPD Officer Brooks had been watching the undercover purchase. Ellerbee broadcast a lookout for Bryant and Williams and performed a field-test of the white substance,[4] which was positive for crack cocaine. An arrest team then located both defendants and arrested them. At trial, Ellerbee testified that he was "very sure" that Bryant was the "person who took [him] to the courtyard and brought [him] the drugs" and that Williams was "the person who [handed] Bryant the drugs that she ... then ... brought back to [Ellerbee]."

MPD Detective Washington, the government's drug expert at trial, explained that drug transactions often involve two layers of distributors, the person "in charge of the drugs" and a "buffer[ ], ... go between[,] or ... freelancer[ ]." "Go-betweens" get "the money from the buyer, go to the seller, and get the drugs from the seller, and ... take the drugs back to the buyer and give it to the buyer." A freelancer is a particular type of go-between who, rather than working directly with the seller, acts independently. A freelancer—"is ... [an] opportunist"; unlike other go—betweens, freelancers

> ... go into these areas and look for individuals who are looking to buy drugs ...—that's their sole purpose.... [T]hey'll make contact with ... people [looking to buy drugs] because [the freelancers] know the area, they know who belong and don't belong in these areas, they'll ... find out what they want, get the money from them, and then go and get the drugs from a person who is selling.... And from that point [the freelancers] take the drugs back to the [buyer], and usually what they'll try to do is get rewarded from the buyer ... they'll try to get part of the drugs or they'll try to get a few dollars for their services rendered.

Freelancers who are "from [an] area," Washington further explained, "know everything about that area."[5] They "take the big risk," as they "go a little bit beyond to solicit customers because they have a purpose for that ... to get money or to get drugs." Their success depends on "how ... the seller feels in allowing these people to work for him," since "these

---

**3.** In Ellerbee's experience, an intermediary such as Bryant would sometimes "keep a part of what was purchased for brokering the deal," sort of as a "tip."

**4.** "It's a little glass test vial," Ellerbee testified; "[y]ou break off a piece of the evidence [and] place it in there. You crack the vial and if it is cocaine base, it will turn blue."

**5.** Testifying in her defense of misidentification, Bryant acknowledged that she had lived in the immediate area for many years.

drug dealers ... will not let outsiders come into the area to work their area."

Bryant's defense was that she had been arrested innocently in the courtyard area while walking to visit friends. Williams, by contrast, offered the testimony of a friend that she and Williams were passing through the courtyard when Bryant, whom she knew, tried to solicit drugs (in vain) from Williams, then approached another person and walked away together with him, leading to Williams' mistaken arrest.

## II.

■ The government's primary evidence that the substance appellants sold was cocaine was the DEA–7 report confirming the laboratory analysis. Appellants both argue that, by not calling as a witness the chemist who did the analysis, the government denied them the opportunity to cross-examine him and thus "confront" the testimonial report. Given our decisions in *Howard* and *Thomas*, the government agrees with this in principle but argues, first, that Williams' failure to object on constitutional grounds at trial requires him to show plain error, *Olano, supra*, something he cannot do in light of our repeated rejection of similar claims. *See Thomas*, 914 A.2d at 22–24; *accord, e.g., Otts v. United States*, 952 A.2d 156, 162–163 (D.C.2008). We are not persuaded, however, that Williams must overcome the plain-error hurdle, given Bryant's objection squarely placing the confrontation issue before the trial court.

■ Normally, a defendant's failure to object on a point subjects his related claim of error on appeal to plain error review. But, "at least in some circumstances, an objection may be preserved when made by

a co-defendant." *Johnson v. United States*, 756 A.2d 458, 462 n. 2 (D.C.2000); *see also Bayer v. United States*, 651 A.2d 308, 311 n. 1 (D.C.1994) ("[w]hen one co-defendant makes an objection at trial which the other co-defendant does not join, the latter can nonetheless benefit from the objection, on appeal, when it applies equally to his or her own situation."). The reason for this, as we explained in *Williams v. United States*, 382 A.2d 1 (D.C.1978), is that the plain error rule is not meant to be "punitive"; instead its purpose is to allow the trial judge "fully to consider issues and thereby avoid potential error, and to afford prosecutors the opportunity to present evidence on the issue raised." *Id.* at 7 n. 12. The government cites other decisions of ours seemingly to the contrary, *e.g., Thacker v. United States*, 599 A.2d 52, 59 (D.C.1991) (failure to "pose any objection at trial and [to] join in the motion of" codefendant subjects belated claim to plain error review). Rather than insist that we resolve the conflict here, however, it limits itself to arguing that Williams should not be allowed to ride "Bryant's coattails" because his failure to join the objection "fairly can be viewed as a tactical choice"—*i.e.*, a desire not to obscure his chosen defense of misidentification. Bryant's defense, however, was also misidentification, and the government all but concedes that it is surmising ("[c]ounsel may have reasoned") that Williams was thinking tactically, and was not just asleep at the switches, when Bryant forcefully challenged the admission of the chemist's report without accompanying testimony.[6] Because the judge was given full opportunity to weigh the constitutional objection, and the prosecution a full chance to argue

---

**6.** Although Williams disassociated himself from Bryant's defense, even accusing her of having tried to solicit drugs from him, he would scarcely have put himself in her company by noting (especially out of the jury's presence, where the discussion of admissibility took place) that he joined in her objection to the DEA–7 report.

for admissibility, *Williams, supra,* justice would not be served by holding Williams to near-forfeiture of the claim in circumstances where we see no plausible tactic behind his attorney's silence.

██ We therefore accept, as to both defendants, the government's concession of error on the distribution charge in light of our decisions, and turn to its modified argument for harmless error, namely, that even under the rigorous standard of *Chapman, supra,* admission of the DEA-7 report did not affect the jury's implicit verdict of guilt on the lesser-included charge of attempted distribution. *See Fields v. United States,* 952 A.2d 859 (D.C.2008) (accepting in principle, but rejecting on facts, government's argument that erroneous admission of DEA-7 report could be harmless as to uncharged, included crime of attempted possession of marijuana); *Doreus v. United States,* No. 06–CF–247, 964 A.2d 154, 2009 D.C.App. Lexis 9 (D.C. Jan. 29, 2009) (same as to lesser-included charge of attempted possession with intent to distribute). On the facts of this case, we believe that the government's argument is well-taken.

██ As we stated recently in *Doreus, supra,* "to prove [the] attempted [drug crime] the government need not prove that the [controlled] substance is the same as that charged in the greater offense." *Id.* at 158, 2009 D.C.App. Lexis 9, at *9. On the other hand, to prove the lesser-included attempt "[t]he government must establish conduct by the defendant[s] ... reasonably adapted to the accomplishment of the crime of [attempted distribution] of the proscribed substance, and the requisite criminal intent." *Seeney v. United States,* 563 A.2d 1081, 1083 (D.C.1989). Here, unlike in *Fields, supra,* the government presented an evidentiary "case where the illegal nature of the substance could be inferred from a transaction during which the defendant had manifested his intent to ... sell a particular drug." *Fields,* 952 A.2d at 865. Indeed, unlike in *Doreus,* Officer Ellerbee's testimony recited an unequivocal transfer of apparent drugs by Williams through Bryant to himself in exchange for money,[7] a transaction the police expert testified was consistent with the practice of drug sellers to use "freelancers" to "come in and be buffers" between the seller and ultimate the buyer. This elaborate sequence—at oral argument the court and parties termed it a minuette—by which Bryant took cash from Ellerbee, led him to the courtyard where she exchanged the money for something from Williams, then gave Ellerbee bags of a white substance that a field test showed to be cocaine, even keeping one bag for herself as a "reward" more than established a *prima facie* case of attempt—including an intent—by the defendants to sell the officer a controlled substance.

Reminding us, however, that a circumstantial *prima facie* case alone cannot negate prejudice from the DEA-7 report under *Chapman, see Fields,* 952 A.2d at 861–864 (discussing in this context *Chapman's* requirement of proof "beyond a reasonable doubt that the error ... did not contribute to the verdict obtained"), Bryant argues

---

7. The *Doreus* court, in rejecting the conclusion "that based on the circumstantial evidence alone, [*i.e.,* without consideration of the DEA-7 report], reasonable jurors would have found the requisite intent for entry of judgment on the lesser-included attempt offense," stressed, *inter alia,* the ambiguous nature of the "hand-to-hand" transaction the officer had observed (but was not a party to), noting his "limited" or equivocal testimony that " 'he couldn't see exactly what [Mr. Doreus] had in his hand' " and that he "didn't see the green money ... *per se,*' " but only " 'believed' the female gave Mr. Doreus U.S. currency." 964 A.2d at 159, 2009 D.C.App. Lexis 9, at *12.

that the entire sequence could have been merely the sale of "bogus drugs"—or "burn bags"—masquerading as a sale of narcotics. She points out that a seller intent on deceiving a buyer in this way would logically seek to mimic the "real thing" as closely as possible. *See Doreus,* 964 A.2d at 162, 2009 D.C.App. Lexis 9, at *21 (Glickman, J., concurring) ("[T]o achieve verisimilitude, someone trying to defraud would-be buyers of cocaine would have every incentive to mimic the behavior of a dealer in the genuine article."). In the circumstances, here, however, the burn-bag hypothesis is too conjectural to undermine the strength of the proof that appellants were attempting, at least, to sell cocaine.

First, in *Doreus, supra,* the court pointed to the "importan[ce]" juries likely attach to expert testimony in drug cases such as this. *Id.* at 159, 2009 D.C.App. Lexis 9, at *15. The burn-bag theory Bryant posits assumes that she and Williams were acting in concert—in cahoots—to sell sugar or baking soda (or the like) as cocaine.[8] Detective Washington, however, described at length a paradigm that by inference cast Bryant in the role of a freelancer, one having no complicity with the seller other that of an "opportunist" who brings a willing buyer together with a seller she knows is nearby (and both of whom may reward such "brokerage"). He was not cross-examined by either defendant about the possibility of a burn-bag sale, see, *by contrast, Washington v. United States,* No. 05–CF–487, 965 A.2d 35, 2009 D.C.App. Lexis 28 (D.C. Feb. 19, 2009) at *23 (detective's testimony "introduced the possibility that appellant's intent was only to possess and sell ... 'burn bags' "); *Doreus,* 964 A.2d at 161–62, 2009 D.C.App. Lexis 9, at *21 (Glickman, J., concurring) (expert "raised at trial, albeit obliquely," possibility that burn bags were involved), nor did either defendant proffer burn-bag evidence to the judge that they planned to elicit if the DEA–7 report were excluded. The defendants themselves, in short, appeared to recognize the implausibility of the burn-bag hypothesis on the facts of this case.

But even if that hypothesis were otherwise plausible in this context of a seller (Williams) and a "buffer" (Bryant) acting independently,[9] it lost its ability to persuade when weighed against the evidence—unobjected to—that the powdered substance Ellerbee had received field-tested positive for cocaine. In *Fields, supra,* we explained that there "evidence about [a] field test was not developed enough to persuade the jury of its reliability." 952 A.2d at 868. Similarly, in *Doreus* we noted that "apparently [no field test] was done" on the recovered substance, 964 A.2d at 156, 2009 D.C.App. Lexis 9, at *6, while stressing that "tests of the drugs recovered in other cases all tend to reveal controlled substances." *Id.* at 160, 2009 D.C.App. Lexis 9, at *16; *see also id.* at 161–62, 2009 D.C.App. Lexis 9, at *21 (Glickman, J., concurring) ("*All* of the government's admissible evidence [in *Doreus*] ... was consistent with the 'burn-bag' hypothesis.") (emphasis added). And most recently, in *Washington, supra,* we reject-

---

8. If Bryant merely *knew,* without more, that Williams sold bogus drugs by reputation, then predictably others in the neighborhood would have known of that reputation as well-making it an exceptionally hazardous trade for Williams to ply there, and equally hazardous for Bryant to bring him customers.

9. If Bryant were Williams' accomplice (and shield) in a scheme to cheat Ellerbee and other buyers, she exposed him to considerable danger by ushering Ellerbee into the courtyard where he could see Bryant give the cash to Williams and receive the "product" in return.

ed reliance on a purported field-test result because defense cross-examination about its reliability had been curtailed. *Washington,* 965 A.2d at 38 n. 2 & 44, 2009 D.C.App. Lexis at *3 n. 2 & 23. Here, Officer Ellerbee's testimony that the substance had field-tested positive for cocaine was unchallenged on cross-examination. While "a positive field test, *standing alone,* [does not] prove beyond a reasonable doubt that [a] substance was cocaine[,]" *Callaham v. United States,* 937 A.2d 141, 147 (D.C.2007) (emphasis added), it added dispositively to the weight of the circumstantial proof that appellants had attempted to sell a controlled substance, rather than a bogus material that just happened to test positive for cocaine.[10]

In sum, these combined circumstances leave us convinced beyond a reasonable doubt that the DEA–7 report did not affect the implicit verdict on the lesser-included charge. *Chapman, supra.*

### III.

 We reject Bryant's remaining claim of error. On cross-examination, the trial judge allowed the prosecutor to elicit from Bryant the fact that she had failed a drug test on the night of her arrest. Later, the judge changed his mind, concluded that the question had been improper, and instructed the jury forcefully to disregard the question and answer. Bryant concedes that a mistrial request (which she made) is properly denied when "prejudice can be cured by an instruction to the jury[,]" *(Antoine) Coleman v. United States,* 948 A.2d 534, 547 (D.C.2008) (internal citation omitted), but argues that the

instruction here came too late *i.e.,* after another defense witness had testified and an overnight recess. We do not agree. The circumstances in another *Coleman* case, *(Ronald) Coleman v. United States,* 779 A.2d 297 (D.C.2001), on which Bryant relies for the inadequacy of a delayed instruction, were markedly different from those here, including the fact that there the risk of the jury drawing an improper propensity inference "continued unchecked through the testimony of four additional and important government witnesses into almost the end of a second day of trial." *Id.* at 306. We have no similar reason here to doubt the efficacy of the curative instruction. Holding instead that only a mistrial could have cured the error here would be a disincentive to the kind of laudable self-correction that the trial judge engaged in.

### IV.

Accordingly, we vacate appellants' convictions for distribution of cocaine and remand for further proceedings, including the choice that the prosecution has to accept entry of convictions for attempted distribution, with appropriate resentencing.

*So ordered.*

---

**10.** We would be remiss in not mentioning the additional fact, relevant particularly to appellant Bryant, that she retained one of the ziplock bags Ellerbee was buying from Williams—a reward for her mediation, according to the pattern Detective Washington

described. To suggest, as Bryant does, that here too she was only mimicking an actual drug sale (or perhaps retaining a ziplock of flour to sell to another unsuspecting buyer) presses the burn-bag hypothesis even farther into the realm of speculation.