Eric R. WASHINGTON, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CF–487.

District of Columbia Court of Appeals.

Argued May 6, 2008.
Decided Feb. 19, 2009.

Judith A. Lovelace for appellant.

J.P. Cooney, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, Thomas J. Tourish, Jr., and Allison L. Barlotta, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and THOMPSON, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Eric R. Washington was tried and convicted on charges of distribution of a controlled substance (cocaine) and possession with intent to distribute a controlled substance (cocaine) ("PWID"). His convictions must be reversed because the trial court admitted a Drug Enforcement Administration chemist's substance analysis ("DEA–7") reports, and refused to allow appellant to cross-examine the chemist in person, despite the government's failure to furnish copies of the DEA–7 reports to appellant in advance of trial as required by D.C.Code § 48–905.06 (2001). These erroneous rulings were not harmless even with respect to the jury's implicit guilty verdicts on the lesser-included offenses of attempted distribution of a controlled substance

and attempted PWID. Accordingly, appellant must be afforded a new trial.

## I.

Police arrested appellant on the afternoon of September 16, 2004, minutes after an undercover officer in a nearby observation post saw him appear to sell drugs to two men who were later identified as Franklin James and Charles Thomas. The observation post officer, Angelo Battle, watched as James and Thomas walked up to appellant, who was sitting in a yard in the 1500 block of Olive Street, N.E. Battle testified that James spoke with appellant and handed him some green bills that "appeared to be U.S. currency." Appellant then went to a fence approximately twenty feet away, moved a brick, and picked up a small green bottle. He poured several "clear ziplock bags containing a white substance" into his hand, put some of the bags back in the bottle, restored the bottle to its hiding place, and returned to James. Appellant and James engaged in a "hand-to-hand transaction," after which James and Thomas departed on foot. As Battle testified at trial, the contents of the green bottle "raised [his] suspicion;" he "identified the items as being a suspected narcotic, possibly crack cocaine or heroin." Battle called in the arrest team, and appellant was promptly apprehended. In a search incident to his arrest, police recovered a crumpled $20 bill from appellant's right front pants pocket and an additional $80 from his right rear pants pocket. Meanwhile, other officers stopped James and Thomas, who were still together. Thomas was found to be in possession of "one clear zip containing [a] white rocky substance."[1] No incriminating evidence

1. The police also recovered a small glass "crack pipe" from Thomas. Appellant successfully objected at trial to the admission of

the crack pipe in evidence, and the court instructed the jury not to consider it. In light of that instruction, the government "does not

was found on James. At Battle's direction, Officer Peter Shaw retrieved the green bottle underneath the brick by the fence. Inside the bottle, which was wrapped in black electric tape, were twelve small clear ziplock bags. These bags too contained a white, rocky substance. They were submitted along with the items seized from Thomas to a Drug Enforcement Administration ("DEA") laboratory for chemical analysis.

At trial, the government relied on the DEA chemist's analyses to prove that the white rocks contained a measurable amount of a controlled substance.[2] The government did not call the chemist to testify in person, however. Instead, over appellant's objection (as we discuss below), the court permitted the government to introduce the chemist's written DEA-7 reports of his analyses. According to those reports, the twelve ziplock bags in the green bottle contained .72 grams of cocaine base, and the ziplock bag recovered from Thomas contained an unquantified residue of the same drug.

The government called Detective Anthony Washington to testify as an expert on the distribution and use of cocaine in the District of Columbia. He explained that sellers often keep their drugs in a hidden "stash" rather than on their person, and that sellers frequently employ "facilitators" to acts as liaisons with unfamiliar buyers. (The government's theory at trial was that James served as such an intermediary between appellant and Thomas.)

Detective Washington further testified that the ziplock bags of crack cocaine found in the green bottle were "specifically packaged for street distribution." Based on the amount of cocaine as reported in the DEA-7, he estimated that each ziplock bag had a street value of $10 to $20. Finally, Detective Washington opined that possession of twelve ziplock bags of cocaine on the street at one time is more consistent with an intent on the part of the holder to distribute the drugs than to use them personally, because users typically limit their purchases to minimize the risk of buying counterfeit drugs:

> Usually when the buyers go out and make purchases of crack cocaine [for personal use], they only buy between one to three bags.... The main reason is there's no quality control out there. An individual go out [sic] and buy illicit drugs on the street, they [sic] don't know what they're buying. It could be from the best cocaine they purchased, to the point where it may not be cocaine at all. If the person buys something that is not cocaine, they can't take it back to the drug dealer and say this is no good, the product is bad, give me my money back. It's a big loss for them. They have to take it as a loss and move on. Normally this is why we don't see individuals out there buying more than three bags at a time.

In his defense, appellant testified that he was on Olive Street visiting his brother

---

rely on the crack pipe as evidence of appellant's intent to possess and distribute cocaine." Supplemental Brief for Appellee at 22 n. 19.

2.  Officer Shaw testified on direct that a field test he conducted on one of the white rocks in the green bottle yielded a positive reaction for cocaine base. However, when appellant sought to cross-examine Shaw about the accuracy of the field test, the prosecutor objected on relevance grounds, arguing that the DEA chemist's report contained "the definitive analysis of what the substance was." The trial court sustained the prosecutor's objection. Because appellant's cross-examination was curtailed, the government "does not rely on [the field test] to support its harmlessness argument" respecting the admission of the DEA chemist's reports. Supplemental Brief for Appellee at 24 n. 22.

and cousin when James, whom he knew, and another man stopped by. Appellant denied receiving any currency from James or selling drugs to anyone. He also denied walking over to the fence, retrieving anything from the green bottle, or possessing any ziplock bags of cocaine. Appellant admitted handing something to James, but he claimed that it was only a cigarette, not cocaine. He further stated that the money in his possession when he was arrested had been given to him by his sister. Appellant's brother, cousin and sister testified and corroborated appellant's account.

## II.

█ Appellant's principal claim—and the only one we need to address [3]—is that he was prejudiced by the government's failure to comply with the notice requirements of D.C.Code § 48–905.06, the statute providing for the admission of chemist's reports as substantive evidence at trial. To enable the defendant to make an informed decision whether to waive the personal appearance of the chemist for cross-examination,[4] the statute requires

the government to "furnish[ ]" a copy of the reports to the defense "no later than 5 days prior to trial."[5] We have held that this five-day notice period is subject to the time computation requirements of Criminal Rule 45, under which intermediate Saturdays, Sundays and legal holidays are excluded, and three days are added for service by mail.[6] As appellant's trial began on February 10, 2005, the government therefore was obliged to mail the DEA–7 reports to his counsel no later than ten calendar days earlier, i.e., January 31, 2005.

The government moved the DEA–7 reports into evidence on the third day of trial. Appellant's counsel objected to their admission on the ground that the government had never furnished him a copy and he had not seen the reports. Counsel added: "I need to discuss with my client if he wants the chemist here." Further inquiry revealed that the government had mailed the DEA–7 reports to appellant's counsel on February 2, 2005, eight calendar days before the start of trial, along with the government's formal notice of

---

**3.** Appellant also contends that the trial court's ruling violated his Sixth Amendment rights.

**4.** *See Giles v. District of Columbia,* 548 A.2d 48, 50–51 (D.C.1988) ("The obvious purpose of this provision is to give sufficient notice to the defendant to decide whether to call the chemist for cross-examination...."). At the time of appellant's trial, the defendant's option under D.C.Code § 48–905.06 was to call the chemist for cross-examination during the defense case. *See Brown v. United States,* 627 A.2d 499, 506–07 (D.C.1993). Subsequently, however, to preserve the statute's constitutionality, we construed it to entitle the defendant to require the prosecution to put the chemist on the witness stand in its case. *(Michael) Thomas v. United States,* 914 A.2d 1, 19–20 (D.C.2006).

**5.** D.C.Code § 48–905. In a proceeding for a violation of this chapter, the official report of chain of custody and of analysis of a controlled substance performed by a chemist

charged with an official duty to perform such analysis, when attested to by that chemist and by the officer having legal custody of the report and accompanied by a certificate under seal that the officer has legal custody, shall be admissible in evidence as evidence of the facts stated therein and the results of that analysis. A copy of the certificate must be furnished upon demand by the defendant or his or her attorney in accordance with the rules of the Superior Court of the District of Columbia or, if no demand is made, no later than 5 days prior to trial. In the event that the defendant or his or her attorney subpoenas the chemist for examination, the subpoena shall be without fee or cost and the examination shall be as on cross-examination.

**6.** *See Belton v. United States,* 580 A.2d 1289, 1291–92 (D.C.1990); Super. Ct.Crim. R. 45(a), (e).

compliance with D.C.Code § 48–905.06. Appellant's counsel represented that he had not received the mailing, had not seen the notice of compliance in the court file when trial started, and had assumed that the government planned to "bring in the chemist."

The trial court did not doubt the veracity of counsel's representations. Nonetheless, the court reasoned, the government had served the DEA–7 reports on appellant's counsel more than five days prior to trial, and appellant's counsel had a "duty" to bring his non-receipt of the reports to the court's attention before he announced ready for trial. Consequently, the court ruled, the government had "satisfied its obligation to notify the defense of its intent to use the DEA–7 documents rather than having the chemist brought in, and any motion that the defense might raise to present the chemist in person is denied." Appellant's counsel noted his objection to that ruling.

The government now concedes, as it must, that its February 2 mailing was too close to the start of trial to comply with the statutory five-day notice requirement, and that the trial court erred in concluding that the government had satisfied its notice obligation. Even so, the government argues, appellant was not entitled to exclude the DEA–7 reports merely because he did not receive them until the third day of trial, for he "did not (and still does not)

contest the DEA–7's contents and made no effort to subpoena the chemist for the defense case or to obtain a continuance" in order to evaluate the need to do so.[7] We think this argument is not well-taken, for in addition to admitting the chemist's reports, the trial court preemptively denied "any" motion the defense "might" have made to present the chemist in person. Perhaps the court did not intend to issue such a sweeping ruling and meant only to allow the government to introduce the DEA–7 reports in evidence without calling the chemist as a witness. But that is not what the court said. Appellant's counsel had advised the court that he "need[ed] to discuss with [his] client if he want[ed] the chemist here." Because the court seemingly anticipated and foreclosed any request by appellant for the chemist to be present (which appellant had a statutory right to request), appellant "was prejudiced by being deprived of an opportunity to decide whether to call the chemist for cross-examination."[8]

The government has not tried to justify the court's preclusive ruling. The ruling was not justified by the failure of appellant's counsel to bring the government's noncompliance with the five-day notice requirement to the court's attention prior to the start of trial. As we recognized in *Johnson*, the defense had no such duty;[9] nor did appellant waive his objections to

7. Supplemental Brief for Appellee at 6. *See, e.g., Belton*, 580 A.2d at 1294 (upholding admission of chemist's report where appellant's counsel received it three days before trial and four days before the government sought to introduce it in evidence; appellant "never asserted to the trial court that the chemical analysis described in the report was inaccurate;" "never indicated that he wished to call the chemist for cross-examination;" "never sought a recess or continuance" to evaluate whether to call the chemist; and "never even suggested that the government's dilatoriness had left him without sufficient time to evalu-

ate the chemist's report"). *See also Washington v. United States*, 600 A.2d 1079, 1081 (D.C.1991) ("Under *Belton*, prejudice may be established by a prompt objection by counsel upon receiving the DEA–7 at trial, and a request for time to review it in order to determine whether to challenge it.").

8. *Johnson v. United States*, 596 A.2d 511, 514 (D.C.1991).

9. *See id.* at 515.

the admission of the chemist's reports by failing to raise them before trial.[10] Indeed, in this post-*Crawford*[11] trial, it was not unreasonable for counsel to infer that the government intended to call the chemist in person,[12] which would have obviated any need to comply with D.C.Code § 48–905.06 (though the government still would have had pretrial disclosure obligations under Criminal Rule 16 upon defense request[13]). Further, the record does not show that appellant's delay in objecting to the untimely service of the DEA–7 reports resulted in the chemist's unavailability to appear in person at trial or otherwise disadvantaged the government's litigating position.

## III.

■ Because the government's failure to comply with the statutory five-day notice requirement and the court's preemptive ruling operated to deny appellant a fair opportunity to decide whether to call the chemist for cross-examination, the ad-

mission of the chemist's reports in evidence was error. As the government concedes, appellant preserved this claim of error by contemporaneous objection at trial.[14] The error therefore necessitates reversal of appellant's convictions unless we are convinced that the error was harmless. In order to conclude that a non-constitutional error was harmless, we must be able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[15] Under this test, the "burden" is not on the appellant to show that he has suffered prejudice; rather, the issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision.[16] "[W]e must find it *highly probable* that [the] error did not contribute to the verdict."[17] In assessing an error's impact, we typically take three factors into consideration: (1) "the centrality of the issue affected by the error;" (2) "the closeness of the case;" and (3) "the steps taken to

---

10. *See Giles*, 548 A.2d at 50–52; *see also (Michael) Thomas*, 914 A.2d at 19–20 (explaining that pretrial inaction by defendant after receiving government's notice of compliance with D.C.Code § 48–905.06 cannot be deemed a waiver of defendant's right to require government to produce chemist at trial for cross-examination).

11. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

12. *See (Michael) Thomas*, 914 A.2d at 5 (holding, light of *Crawford*, that "the defendant enjoys a Sixth Amendment right to be confronted with the chemist in person").

13. *See* Super. Ct.Crim. R. 16(a)(1)(D), (E). Neither in the trial court nor in this court has the government suggested that appellant waived his right to object to the admission of the chemist's reports by failing to request them in pretrial discovery or by failing to pursue his request for them.

14. The government disputes whether appellant preserved his Sixth Amendment claim, an issue that we consider moot.

15. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

16. *O'Neal v. McAninch*, 513 U.S. 432, 436–40, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *see also, e.g., United States v. Olano*, 507 U.S. 725, 734, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (explaining that where a trial error has been preserved, the burden of persuasion is not on the appellant to show prejudice, but on the government to demonstrate lack of prejudice).

17. *Wilson–Bey v. United States*, 903 A.2d 818, 844 (D.C.2006) (en banc) (internal quotation marks omitted).

mitigate the effects of the error." [18] As no mitigating measures were taken in this case, our focus must be on the first two factors.

■ To convict appellant of the distribution and PWID offenses with which he was charged, the government needed to prove that what he distributed or possessed was a controlled substance, namely cocaine or a mixture containing cocaine, in a measurable amount.[19] As the DEA–7 reports alone supplied that essential proof, the error in admitting those reports unquestionably influenced the jury's verdict and cannot be deemed harmless with respect to appellant's distribution and PWID convictions. Those convictions cannot stand.

■ At oral argument in this court, the government argued for the first time on appeal that the admission of the DEA–7 reports, if deemed erroneous, was harmless with respect to the jury's implicit verdicts of guilty on the lesser-included offenses of *attempted* distribution of a controlled substance (cocaine) and *attempted* PWID (cocaine).[20] On that premise, the government asks us to direct the trial court on remand to vacate appellant's convictions for the greater offenses and enter judgment on the lesser-included offenses.[21] In order to consider this belated contention, we requested and have received supplemental post-argument briefs from the parties. We have discretion to overlook the government's failure to make a timely harmlessness argument in its initial brief, though "only in the rare circumstance in which harmlessness is obvious." [22]

With respect to the lesser-included attempt offenses, the government argues, the DEA–7 reports were essentially superfluous, because the attempt offenses (un-

18. *Andrews v. United States*, 922 A.2d 449, 459 (D.C.2007) (citing *Allen v. United States*, 837 A.2d 917, 921 (D.C.2003)).

19. *See (Sean) Thomas v. United States*, 650 A.2d 183, 197 (D.C.1994) (en banc) (holding that in order to secure a conviction for possession or distribution of a controlled substance, "the government must show either by direct or circumstantial evidence that the substance in question contained a measurable amount of a controlled substance"); *Hicks v. United States*, 697 A.2d 805, 807 (D.C.1997) (holding that proof of "a measurable amount of a mixture containing cocaine is sufficient to sustain a conviction" for possession of a controlled substance (cocaine), even absent proof of a measurable quantity of the active ingredient, cocaine).

20. The government has made a comparable harmlessness argument in other cases in which a DEA chemist's report was admitted in error. *See Doreus v. United States*, 964 A.2d 154 (D.C. 2009) (error not harmless with respect to lesser-included offense of attempted PWID cocaine); *Fields v. United States*, 952 A.2d 859 (D.C.2008) (error not harmless with respect to lesser offense of attempted posses-

sion of marijuana). In each of those cases, the introduction of the chemist's report violated the Confrontation Clause of the Sixth Amendment, and harmlessness therefore had to be shown beyond a reasonable doubt-a more stringent test than the one we apply in this case of non-constitutional error.

21. We may direct entry of judgment on a lesser-included offense when a conviction on the greater offense is reversed on grounds that affect only the greater offense, i.e., where the lesser offense was not affected by the error. *Willis v. United States*, 692 A.2d 1380, 1383 (D.C.1997) (citing *Rutledge v. United States*, 517 U.S. 292, 306, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996)). An attempt is a lesser-included offense of the completed crime, and a defendant may be convicted of an attempt even if the evidence shows that the completed crime was committed. *See Evans v. United States*, 779 A.2d 891, 894 (D.C.2001). An attempt to commit an offense under the Controlled Substances Act is subject to the same punishment as is the completed offense. D.C.Code § 48–904.09 (2001).

22. *Randolph v. United States*, 882 A.2d 210, 226 (D.C.2005).

like the greater offenses) did not require the government to prove either the identity or the measurable quantity of what appellant attempted to distribute or possess.[23] It need not have been a controlled substance at all; what matters is that appellant believed it to be one. The attempt offenses required the government to prove only that appellant (1) intended to possess and distribute a controlled substance, and (2) engaged in conduct "reasonably adapted to the accomplishment of" the intended crimes.[24] The government presented ample credible evidence, independent of the chemist's reports, to prove those elements. In brief, as recounted more fully above, an experienced undercover officer saw appellant exercise dominion and control over a hidden cache of ziplock bags containing a white rock substance and sell at least one of the ziplock bags to James and Thomas for cash, which was recovered promptly from appellant's person. The white rock substance had the appearance to the undercover officer of being crack cocaine or heroin. And a police expert in the drug trade testified that the circumstances—in particular, the quantity and packaging of the suspected contraband, the use of a "stash," and the employment of a "facili-

tator" (i.e., James, under the prosecution's theory at trial)—were characteristic of street-level drug distribution. Certainly, the surreptitious transaction was anything but innocent. The government does not deny that the DEA–7 reports also helped prove appellant guilty of the attempt offenses. That would be too strong a claim to make, for proof that what appellant possessed and distributed actually was cocaine constituted substantial evidence of his criminal intent.[25] Nonetheless, the government argues, a reviewing court can be confident that a rational jury considering the admissible evidence alone would have inferred that appellant attempted to possess and distribute a controlled substance, and that the inadmissible chemist's reports therefore did not "substantially sway" the jury to make that finding.

■ We agree that the evidence *sans* the chemist's reports was sufficient to support the jury's implicit finding that appellant attempted to possess and distribute a controlled substance.[26] But that does not mean the chemist's reports had no influence on that finding. "Mere sufficiency of the evidence . . . does not dictate a finding

---

**23.** *See Thompson v. United States*, 678 A.2d 24, 27 (D.C.1996) ("[T]he government was not required to prove that the substance actually was cocaine in order to establish appellant's guilt of attempted distribution."); *Seeney v. United States*, 563 A.2d 1081, 1083 (D.C.1989) ("With respect to the offense of *attempted* possession with intent to distribute, . . . it is not necessary to establish that the substance a defendant attempted to possess was the proscribed substance.").

**24.** *Seeney*, 563 A.2d at 1083. In many cases, we have added that the act constituting an attempt must come within "dangerous proximity" of completing the crime, a formulation attributed to Justice Holmes. *See Jones v. United States*, 386 A.2d 308, 312 (D.C.1978). This formulation has been criticized, and from time to time the government has urged

us to jettison it in favor of the Model Penal Code alternative, under which the act need be only a "substantial step" towards completion of the crime. *See In re Doe*, 855 A.2d 1100, 1107 n. 11 (D.C.2004). The issue need not concern us here; under any definition, appellant's conduct satisfied the actus reus requirement for an attempt, assuming appellant performed it with the required mens rea.

**25.** *See, e.g., Fields*, 952 A.2d at 865 ("The DEA–7 report was offered as proof that *what* appellant possessed was marijuana. . . . If the case had been charged and tried for attempted possession, the DEA–7 report similarly would prove that what appellant intended to possess was a controlled substance, marijuana.").

**26.** *See Thompson*, 678 A.2d at 27–28.

of harmless error."[27] The mens rea element of the attempt offenses required the government to prove that appellant intended to possess and distribute a controlled substance; in other words, that appellant *believed* he was selling drugs rather than something else. Absent the chemist's reports, this could have been the central issue at trial, for the government's own expert witness raised an alternative possibility. As Detective Washington explained, "there's no quality control out there." Consumer deception is an ever-present possibility: buyers "don't know what they're buying. It could be from the best cocaine they purchased, to the point where it may not be cocaine at all." Importantly, the risk of being defrauded is great enough that "this is why we don't see individuals out there buying more than three bags at a time." Detective Washington's testimony, which the jury had no reason to disbelieve, introduced the possibility that appellant's intent was only to possess and sell so-called "burn bags"— bags containing fake drugs rather than the real thing. Such an intent does not satisfy the mens rea element of attempted distribution or PWID.

■■■ Without the DEA–7 reports (and the results of the field test, which we disregard, see footnote 2, *supra* ), the remainder of the government's evidence was consistent with the burn bag hypothesis; it looked like he was selling drugs, but "to achieve verisimilitude, someone trying to defraud would-be buyers of cocaine would

have every incentive to mimic the behavior of a dealer in the genuine article."[28] Furthermore, at the close of trial, in the absence of the chemist's analysis,

> appellant's counsel could have argued forcefully that the government had not met its high burden of proof as to appellant's intent to possess [and distribute] a controlled substance when it had not even shown what the ziplock bags contained. This might have been a difficult argument to counter, for the prosecutor would have been unable to rule out the "burn bag" hypothesis or to explain the conspicuous gap in the government's proof. The unanswered questions might have loomed large in the jury's deliberations.[29]

In other words, the admissible evidence by itself might have left a rational jury with a reasonable doubt as to whether appellant intended to possess and sell a controlled substance as opposed to an imitation drug. The inadmissible DEA–7 reports might have influenced the jury's implicit finding of the required mens rea in this case precisely because they alone effectively refuted the burn bag scenario.

The government argues, however, that there *was* other evidence in this case, namely appellant's own testimony, that would have led a rational jury to find he intended to sell real rather than fake drugs. As the government points out, Detective Washington attributed the prevalence of counterfeit drugs to the buyer's

---

27. *Bell v. United States*, 801 A.2d 117, 129 (D.C.2002).

28. *Doreus*, 964 A.2d at 161–62, op. at 14 (Glickman, J., concurring).

29. *Id.* "[T]he defense is always free to comment on the absence of evidence in arguing to the jury that the government has not met its burden to prove guilt beyond a reasonable doubt." *Wheeler v. United States*, 930 A.2d

232, 238 (D.C.2007). And the gap alone can be enough to sustain a reasonable doubt. *See, e.g., Greer v. United States*, 697 A.2d 1207, 1210–11 (D.C.1997) (finding harm where trial court erroneously foreclosed defense from arguing the lack of corroborative evidence); *see also Smith v. United States*, 709 A.2d 78, 82 (D.C.1998) (en banc) (stating, in model jury instruction, that reasonable doubt may arise from "the evidence *or lack of evidence* in the case" (emphasis added)).

lack of a remedy for fraud: "If the person buys something that is not cocaine, they [sic] can't take it back to the drug dealer and say this is no good, the product is bad, give me my money back.... They have to take it as a loss and move on." In his trial testimony, however, appellant admitted having frequented the area where he allegedly sold cocaine to James and Thomas, and having known James as well as others in that area. Therefore, the government reasons, the jury would have inferred that appellant did not knowingly sell fake drugs to the purchaser in this case because appellant knew the purchaser would have been able to return the bad product to him for a refund. (To this it could be added, though the government has not chosen to do so, that appellant did not claim in his testimony that he sold only burn bags.)

▮ We are not persuaded by these considerations. Preliminarily, we doubt the propriety of considering appellant's testimony where, as here, the issue is not sufficiency of the evidence to support the jury's verdict, but whether inadmissible evidence might have influenced that verdict. It is plausible to think that appellant would not have taken the witness stand had there been no evidence in the government's case-in-chief of the DEA chemist's laboratory results (even assuming, as we do, that the government would have survived a defense motion for judgment of acquittal).[30] The government therefore should not receive the benefit of appellant's testimony when we evaluate whether he was prejudiced by the erroneous admission of the DEA–7 reports. But even if we do consider appellant's testimony, we

think it does not alter the evidentiary equation. The mere fact that a cheated buyer might have been able to find appellant again does not mean he would have been willing and able to demand a refund from him. In the dangerous criminal milieu of drug dealing, we readily can imagine compelling reasons why a buyer, out only $20, would have "take[n] it as a loss and move[d] on," in the words of Detective Washington. (We similarly perceive strong reasons why appellant would not have taken the witness stand to admit having sold counterfeit drugs to unsuspecting buyers.)

To find the error in this case harmless with respect to the lesser-included attempt offenses, we must be fairly assured that the error did not sway the jury's judgment—that a rational jury would have found beyond a reasonable doubt that appellant intended to sell cocaine (or some controlled substance) even without the chemist's analysis of the suspected contraband. For the reasons stated, we lack such assurance.

*Reversed.*

Opinion for the court by Associate Judge GLICKMAN.

REID, Associate Judge, concurring:

I fully agree that Mr. Washington was prejudiced due to the government's failure to adhere to the notice requirements of D.C.Code § 48–905.06. I also agree that the trial court's ruling allowing the admission of the DEA–7 reports was not harmless under *Kotteakos v. United States,* 328

---

**30.** We must set aside the likelihood that the government could have secured the DEA chemist's live testimony if the trial court had excluded the DEA–7 reports in the chemist's absence. The inquiry into harmless error focuses on the impact of the error in the trial that actually occurred, not on whether the same verdict would have been reached in a different trial in which the error was avoided. *See Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Ellis v. United States,* 941 A.2d 1042, 1049 (D.C. 2008).

U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), with respect to the lesser-included offense and the intent element. In my view, the inferences which the government seeks to draw from Mr. Washington's admission that he frequented the drug sale area and knew Mr. James and others, together with other circumstantial evidence, is not strong and compelling enough to support a harmless error conclusion concerning the intent element of the lesser-included offense.

I write separately, because of Judge Glickman's invocation of and reliance on the "burn bag" theory in his harmless error analysis. I believe that in a harmless error analysis, such as that in this case, there is a limit to which we can rely on a few sentences culled from testimony presented by the government's expert witness, to invoke "the possibility that appellant's intent was only to possess and sell so-called 'burn bags'—bags containing fake drugs rather than the real thing." That "possibility" may lead to the arena of speculation and may result in ignoring or undercutting strong and compelling circumstantial evidence of intent in greater and lesser-included drug offense cases, even though we have said consistently and repeatedly that there is no distinction between direct and circumstantial evidence. *See Spencer v. United States*, 688 A.2d 412, 415 (D.C.1997) (citations omitted).