**Electronically Filed
Supreme Court
SCWC-15-0000439
09-OCT-2017
08:40 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Petitioner/Plaintiff-Appellee,

vs.

LAWRENCE L. BRUCE and JUSTIN MCKINLEY,
Respondents/Defendants-Appellants.

SCWC-15-0000439

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000439; CAAP-15-0000477; CR. NO. 14-1-0987)

OCTOBER 9, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

## I.  INTRODUCTION

Petitioner/Plaintiff-Appellee State of Hawai'i (the State) charged Respondent/Defendant-Appellant Lawrence L. Bruce (Bruce) and Respondent/Defendant-Appellant Justin McKinley (McKinley) with offenses arising from their alleged involvement

in and benefit from the activities of a prostitute, the complaining witness (CW).  After being tried as co-defendants in the same jury trial, the jury found Bruce guilty of promoting prostitution in the second degree, and found McKinley guilty of promoting prostitution in the first degree.

Bruce and McKinley appealed, arguing, inter alia, that their trials were tainted by prosecutorial misconduct.  The Intermediate Court of Appeals (ICA) held that one of the prosecutor's comments during rebuttal closing argument constituted misconduct, and that such misconduct was not harmless beyond a reasonable doubt.  Thus, the ICA vacated Bruce's and McKinley's convictions and remanded their cases for new trials.

For the reasons stated below, we conclude that the prosecutor's comments during rebuttal closing argument did not constitute misconduct.  Although the prosecutor's comments could be interpreted as appealing to the jury's passions and prejudices when viewed in isolation, we believe that the comments, properly analyzed in context, were relevant to the fundamental issues at trial.  Consequently, the comments were not improper.

Accordingly, as to Bruce, we reverse the ICA's November 17, 2016 judgment on appeal filed pursuant to its October 20, 2016 memorandum opinion, which vacated the Circuit Court of the First Circuit's (circuit court) May 5, 2015 judgment of

conviction and sentence and remanded the case for a new trial. As to McKinley, we reverse the ICA's September 29, 2016 judgment on appeal filed pursuant to its August 31, 2016 memorandum opinion, which vacated the circuit court's May 5, 2015 judgment of conviction and sentence and May 5, 2015 mittimus and warrant of commitment to jail, and remanded the case for a new trial.

## II. BACKGROUND

### A. Circuit Court Proceedings[1]

On June 17, 2014, Bruce was charged with one count of promoting prostitution in the first degree in violation of Hawaiʻi Revised Statutes (HRS) § 712-1202(1)(a) and one count of sexual assault in the first degree in violation of HRS § 707-730(1)(a). McKinley was charged with one count of promoting prostitution in the first degree in violation of HRS § 712-1202(1)(a), two counts of sexual assault in the first degree in violation of HRS § 707-730(1)(a), and one count of kidnapping in violation of HRS § 707-720(1)(d). Bruce and McKinley were tried as co-defendants at the same jury trial.

CW was one of the witnesses who testified on behalf of the State. CW testified that she came to Honolulu, Hawaiʻi from San Diego, California on April 1, 2014. She attested that her initial purpose for coming to Hawaiʻi was to earn money through

---

[1] The Honorable Randal K.O. Lee presided.

3

prostitution so she could return home to Alaska. CW stated that her former pimp, Lando, had advised her to go to Hawaiʻi.

CW testified that after arriving in Hawaiʻi, she went to a hostel in Waikīkī, where she met a man named "L-Way" for the first time. CW identified Bruce as L-Way at trial. CW testified that upon meeting Bruce, Bruce informed CW of the sexual services that she was to provide and the prices that she was to charge therefor. CW also attested that during their initial discussions, Bruce instructed CW on how she was to dress, act, and speak if she were to walk the streets as a prostitute.

CW testified that rather than walking the streets, it was determined that she would solicit clients via her internet advertisement on a website called Backpage. CW attested that she had previously posted a Backpage advertisement for sexual services in San Diego, and that Bruce used his iPad to re-post and update her advertisement to reflect her relocation to Hawaiʻi. CW stated that Bruce paid $5 to promote her advertisement by "bring[ing] it to the top" of the list of advertisements on the website.

CW attested that she and Bruce then had sexual intercourse as a way of "initiating that [she was his] girl now." She testified that after they had intercourse, Bruce said "[t]hat [she] was his girl now." CW stated that after becoming Bruce's

4

"girl," she "work[ed] for him now."

CW testified that she stayed at the hostel for about ten or eleven days with Bruce, Jennie Ortegon (the mother of Bruce's son), and his son.  She testified that while she stayed at the hostel, Bruce was "[r]ight there with [her]" and did not leave her alone.  CW attested that in addition to the room in which CW, Bruce, and his family slept, Bruce rented a separate room at the hostel, which was solely used for dates with clients.

CW testified that during her stay at the hostel, she provided sexual services for one client.  CW attested that she gave all of the money that she received from the client to Bruce, because she "became his girl" and "when you do prostitution, you give the guy the money.  And if you don't, then . . . [y]ou can serve consequences . . .  [like] [g]et[ting] beat up."

CW testified that on or about April 11, 2014, she and Bruce left the hostel and relocated to a Best Western hotel per McKinley's recommendation.  She stated that before leaving the hostel, Bruce had asked CW to give her I.D. and social security card to him so she "wouldn't be able to go nowhere."  CW testified that she complied with Bruce's request; upon arriving at the Best Western, Bruce did not return her I.D. or social security card to her.

CW testified that when she arrived at the Best Western,

Bruce introduced her to McKinley, another pimp, and Keshawn Stewart (Stewart), who was also a prostitute. CW, Bruce, McKinley, and Stewart stayed in the same hotel room together. CW testified that during her two-week stay at the Best Western, she earned about $1,000 by providing sexual services to clients, but she turned all proceeds over to Bruce.

On April 13, 2014, CW and Stewart received a call from a customer who requested two prostitutes to meet him at the Executive Centre Hotel (Executive Centre). CW testified that she told Stewart that she "didn't think that [they] should go on that date because . . . the guy sounded funny, like he was a cop." She stated that Bruce, who was sitting next to her when she expressed her concerns to Stewart, told her that "[h]e wanted [CW] to go on that date."

CW attested that after they met the customer at the hotel room in the Executive Centre, the customer gave $700 to Stewart. CW testified that after he placed the cash in Stewart's hand, the customer excused himself to go to the restroom. Subsequently, police entered the room and arrested Stewart and CW. The "customer" was actually a police officer from the Honolulu Police Department (HPD), who had contacted CW and Stewart as part of an undercover investigation and sting operation.

Following her arrest, CW spoke to HPD Officer Lovinna Kaniho (Officer Kaniho) at the Executive Centre. Officer Kaniho asked CW if she needed help getting out of prostitution. CW testified that she refused help at the time because when Officer Kaniho had spoken to her, Stewart was present. CW stated that she was concerned that if she accepted Office Kaniho's help, Stewart would inform Bruce and McKinley that CW had agreed to help the police. Subsequently, CW and Stewart were taken to jail. CW was released on bail the next morning, and returned to the Best Western.

CW testified that after she was arrested on April 13, 2014, she did not want to engage in prostitution anymore. CW explained that she was selling her body for money, and she felt like she "was somebody's property." She attributed her feelings to Bruce's "pimp demeanor." CW described Bruce's "pimp demeanor" as follows: "[If] you do something wrong, you're going to get beat, or you're just out here making money for [him] and giving it to him. He just had that demeanor." CW stated that despite her reservations, she felt like she "had to" keep prostituting because she "wanted to go home" and because she "didn't want to get beat up."

CW attested that on April 18, 2014, she went to the Ala Moana Shopping Center to buy new clothes. She testified that she

needed to ask Bruce for permission to go to the mall, and that she remembered asking him, through text message: "Daddy, can I go with [Stewart] to the mall, please?" She stated that she called Bruce "Daddy" because "that's what girls call their pimps."

CW testified that while she was at the mall, Bruce kept in contact with her via text message, and told her to "make sure [she] tell him [sic] every place that [she] go [sic] or what [she's] doing." CW also stated that Bruce, by text, told her to take a picture of what she was wearing that day, because "there was money" around the mall. CW testified that she understood his comment to mean that she was to look for dates.

CW attested that on or around April 18, 2014, Bruce left the Best Western for a few days and did not return. CW testified that McKinley then called Bruce and told him that CW was "going to become his girl now since [Bruce's] gone and left [her] behind." CW stated that at that point, she "bec[a]me [McKinley's] property." Bruce returned to the Best Western on April 19, 2014 and turned over CW's I.D. and social security card to McKinley. CW stated that after that date, she made over $1,000 by going on dates with clients. CW testified that she turned over all of her earnings to McKinley because she "was his property," and that McKinley treated her "[l]ike property."

8

After staying at the Best Western for two weeks, CW relocated to the Pagoda Hotel (Pagoda) with McKinley and Stewart. At the Pagoda, there was an incident where McKinley beat CW by hitting her face and legs and choking her. Bruce was present during the incident and took a video recording of it on his cell phone.

The video of the incident was entered into evidence without objection, and was played for the jury. In the video, as he was hitting CW, McKinley said, inter alia, that CW was "costing everybody money," that she was "costing [him] money with [her] games," and that CW was to "[g]et money by all means necessary." After remarking that calls to CW's phone were being sent to voicemail, McKinley said: "I'm going [to] beat your brains."

CW testified that while she did not know why McKinley had beaten her that day, she believed that when McKinley, in the video, referred to calls going to voicemail, he was likely referring to calls from clients that CW did not answer. CW attested that at the time, she was not answering calls to her cell phone in response to her Backpage advertisement because she "didn't want to prostitute no more."

CW stated that on May 13, 2014, after attending a hearing related to her arrest in April 2014, she went to Queen's

9

Medical Center because she was not feeling well.  She was admitted to the hospital after a urine test revealed that she was three months pregnant.  After leaving the hospital, CW went to a safe house and filed a police report.  CW subsequently met with Officer Kaniho and provided a statement.

Following CW's testimony, the State entered Exhibit 33, a log of text messages that were sent to and from a T-Mobile cell phone in April 2014, into evidence.  The T-Mobile cell phone was found on Bruce's person when he was arrested.  According to the State, Exhibit 33 detailed a series of text messages between CW and Bruce, which corroborated CW's testimony regarding the text messages she sent and received when she went to the Ala Moana Shopping Center.

After the State rested its case, Bruce orally moved for a judgment of acquittal on his charges for promoting prostitution in the first degree and sexual assault in the first degree.  The circuit court granted Bruce's motion with regard to the sexual assault charge.  The circuit court granted in part and denied in part Bruce's motion with respect to his charge of promoting prostitution in the first degree, finding that "there's sufficient evidence of promoting prostitution in the second degree, but not in the first degree."

Similarly, McKinley moved for a judgment of acquittal

on all of his charges.  The circuit court granted the motion with respect to his kidnapping charge, but denied it as to all of the other charges.

Stewart testified on behalf of McKinley.  Much of her testimony conflicted with CW's testimony.  She testified that she learned about the prostitution scene in Waikīkī through CW, and that she and CW occasionally prostituted together on a voluntary basis.  Stewart stated that she and CW kept their earnings from going on dates, but that CW sometimes gave a small portion of her earnings to Stewart and McKinley to help cover the costs of the hotel room.  Stewart attested that McKinley was her boyfriend, not her pimp, and that McKinley did not play a role in Stewart's or CW's involvement in prostitution.  Stewart testified that while she was aware of the incident in which McKinley beat CW, it was her understanding that McKinley had beaten CW in response to Stewart's complaints that CW had stolen her money, and that CW was not covering her share of the hotel room costs.

Bruce testified on his own behalf.  His testimony drastically diverged from CW's testimony.  Bruce attested that he was not the person whom CW had identified as "L-Way."  Rather, Bruce asserted, L-Way was CW's boyfriend, who also went by the name "Lando."  Bruce testified that he met Lando in Hawaiʻi, and that they had been acquaintances since December 2013.  Bruce

11

stated that he met CW in April 2014 while he was walking back to the hostel with his son.

Bruce asserted that from December 2013 to June 2014, Ortegon, the mother of his child, had his T-Mobile cell phone in her possession and was using it during that time. Accordingly, he testified that from December 2013 to June 2014, the text messages sent to and received by the T-Mobile cell phone were not between himself and CW. Bruce testified that the text messages from December 2013 to June 2014, including those sent and received during April 2014, were between Ortegon and Lando. To Bruce, these text messages supported that Bruce was not L-Way.

Bruce denied managing CW as a prostitute and denied being CW's pimp. Bruce testified that he never had sexual intercourse with CW, and that he did not promote or pay to promote CW's Backpage advertisement. Bruce further attested that CW did not live at the hostel with him or his family, that he did not rent any extra rooms to facilitate prostitution activities, and that he was unaware of whether any prostitution activities were taking place at the hostel. Bruce asserted that he did not set the prices for CW's sexual services, that he did not have CW walk the streets as a prostitute, and that he never made money off of CW by way of prostitution.

Bruce testified that he took a video recording of the

12

incident where McKinley beat CW at the Pagoda. Bruce attested that he took the video because he wanted to show it to Lando, CW's boyfriend, and that he in fact did share the video with Lando.

Following jury instructions, the parties presented their closing arguments. Bruce's counsel argued that the evidence demonstrated that he was not L-Way, that he was not her pimp, and that he had never managed her as a prostitute. McKinley's counsel argued that the jury could infer, based upon the evidence, that CW had engaged in prostitution voluntarily, and that McKinley did not force her to do prostitution. He argued that the video tape of McKinley beating CW did not demonstrate that he had compelled her to engage in prostitution against her will, as the evidence indicated that McKinley had beaten CW because he was fed up with living with a roommate who he believed was stealing money from his girlfriend, Stewart.

In rebuttal closing argument, the prosecutor countered:

> So this whole thing about [CW] lying and can't be believed, well, the only people who can't be believed was Keshawn Stewart and Mr. Bruce. The fact of the matter is that they treated her like she was property.
>
> . . . .
>
> . . . They didn't see her as anything more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force. That is how they viewed her, that is how they treated her. But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a

13

> mother, she's a woman, she is a person, and she
> deserves to be treated properly[.]

(Emphases added.) As to the prosecutor's comment that CW was "somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person," McKinley objected on grounds that "this is a little bit far beyond arguing the evidence." Bruce did not join McKinley's objection, nor did he raise one of his own. McKinley's objection was overruled.

On January 26, 2015, the jury found Bruce guilty of promoting prostitution in the second degree. The jury found McKinley guilty of promoting prostitution in the first degree and not guilty of sexual assault in the first degree. The circuit court[2] entered its final judgment of conviction and sentence for both Bruce and McKinley on May 5, 2015. On the same day, the circuit court entered its mittimus and warrant of commitment to jail with respect to McKinley.

## B. ICA Proceedings

On appeal, both Bruce and McKinley argued, inter alia,[3]

---

[2] The Honorable Paul B.K. Wong signed both final judgments and the mittimus and warrant of commitment to jail.

[3] Bruce also raised several other points of error on appeal, including: (1) whether the evidence at trial was sufficient to support his conviction; (2) whether the circuit court abused its discretion in allowing Detective Derek Stigerts (Detective Stigerts) to testify as an expert on the commercial sexual exploitation of women; (3) whether the State committed prosecutorial misconduct in characterizing the case as a "sex trafficking" case and alluding to the practice of slavery; and (4) whether the circuit court abused its discretion by allowing Ortegon to assert her Fifth Amendment privilege against
(continued...)

14

that the prosecutor engaged in prosecutorial misconduct when she stated: "But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly." Bruce acknowledged that he did not object to the remarks at trial, and that therefore, "the appellate court must determine whether the misconduct constituted plain error that affected Bruce's substantial rights."

Relying on State v. Rogan, 91 Hawaiʻi 405, 984 P.2d 1231 (1999), Bruce argued that by referencing CW's gender and familial status, the prosecutor improperly appealed to the jury's passions and prejudices, invited the jurors to place themselves in CW's position and render the verdict based on their emotions rather than the evidence, and injected irrelevant issues into

---

[3](...continued)
self-incrimination under the United States Constitution. McKinley similarly challenged whether Detective Stigerts was qualified to testify as an expert witness, and asserted that the prosecutor committed misconduct in characterizing the case as a "sex trafficking" case and in referencing the practice of slavery during the State's closing argument.

In brief, the ICA held: (1) the State presented sufficient evidence to support that Bruce was guilty of promoting prostitution in the second degree, (2) the circuit court did not abuse its discretion in qualifying Detective Stigerts as an expert and allowing Detective Stigerts to testify as an expert witness, (3) the prosecutor did not commit prosecutorial misconduct during closing argument either when she described the case as a "sex trafficking case," or when she alluded to the practice of slavery, and (4) the circuit court did not abuse its discretion when it did not compel Ortegon to testify on Bruce's behalf. On certiorari, the State has not raised any questions pertaining to the ICA's holdings on these points. Neither Bruce nor McKinley filed a response to the State's application for writ of certiorari to challenge any of these rulings. Accordingly, we do not address any of these issues. See Hawaiʻi Rules of Appellate Procedure Rule 40.1(d) (2014).

15

their deliberations.  Thus, Bruce contended that he was deprived of a fair trial because the comments rose to the level of prosecutorial misconduct, the State did not have a strong case against Bruce, and no curative instruction was given.  In his appeal, McKinley advanced arguments that aligned with the arguments that Bruce had made.

On October 20, 2016, the ICA issued a memorandum opinion that vacated Bruce's conviction and sentence and remanded the case for a new trial.  The ICA held that "based on the Hawaiʻi Supreme Court's analysis in Rogan, the State's remarks, when viewed in context, were improper and, thus, constituted prosecutorial misconduct."  The ICA likened the comments in this case to those made by the prosecutor in Rogan, and concluded that "CW's status as a daughter, friend, mother, and woman, while perhaps supported by the evidence, was not a disputed fact at trial and was not relevant to whether Bruce or McKinley did in fact view or treat CW as a 'piece of property.'"  Therefore, to the ICA, "the State's comments about CW's relationship to others did not bolster the validity of the State's theory of the case."

The ICA also held that the prosecutor's comments "were meant to humanize CW in the eyes of the jury evoking sympathy for her," and "represented an implied invitation for the jury to place themselves in CW's position, or in the position of someone

16

near to her, enticing the jury to render a decision based on emotional appeal rather than on the evidence that proved Bruce's guilt."  Thus, the ICA held that the comments constituted prosecutorial misconduct.

The ICA then applied the three-prong harmless error test for prosecutorial misconduct.  The ICA ultimately concluded that the prosecutor's comments were not harmless beyond a reasonable doubt because:  (1) the prosecutor's comments were improper; (2) McKinley's objection to the State's comments was overruled; and (3) the State did not present overwhelming evidence against Bruce.

In a footnote, the ICA noted that although McKinley objected to the prosecutor's comments, Bruce did not join in the objection.  Observing that other jurisdictions have held that an objection by one defendant preserves the issue for a co-defendant's appeal, even where the co-defendant does not join in the objection at trial, the ICA held that "under the facts of this case, McKinley's objections to the State's remarks sufficiently preserved the issue for Bruce's appeal."

The ICA's memorandum opinion resolving McKinley's appeal, filed on August 31, 2016, similarly concluded that the disputed comments by the prosecutor constituted misconduct.  The ICA's analysis in McKinley's case was substantially identical to

17

the analysis it employed in Bruce's case.  Accordingly, the ICA vacated McKinley's conviction and sentence and remanded his case for a new trial.

### III.  STANDARD OF REVIEW

### A.   Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of 'whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'"  Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238 (quoting State v. Sawyer, 88 Hawaiʻi 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998)).

### IV.  DISCUSSION

We are presented with the following three questions on certiorari:  (1) whether the ICA erred in holding that McKinley's objection sufficiently preserved the issue on appeal for Bruce, who neither joined McKinley's objection nor raised one of his own; (2) whether the ICA misapplied this court's opinion in State v. Rogan to the present case; and (3) whether the ICA's analyses resolving Bruce and McKinley's appeals are obviously inconsistent with its own opinion in State v. Kiakona, 110 Hawaiʻi 450, 134

18

P.3d 616 (App. 2006).[4]  Each is addressed in turn.

## A.   McKinley's objection to the prosecutor's remarks sufficiently preserved the issue for Bruce's appeal.

The State contends that the ICA erred by holding that McKinley's objection to the State's remarks adequately preserved the issue for Bruce's appeal.  The State argues that assuming that one defendant's objection applies to all defendants in cases where multiple defendants are being tried is impracticable, as each defendant may have different trial strategies, and one defendant's objection may not necessarily benefit the other's case.  The State also emphasizes that a defendant only needs to utter two words, "I join," to indicate whether he or she is joining in the co-defendant's objection and to preserve the issue on appeal.

The State's argument presents the following issue of first impression:  whether an objection by one defendant preserves the issue on appeal for a co-defendant who does not raise his or her own objection or join the defendant's objection.

Courts in other jurisdictions have adopted one of two approaches to resolve this issue.  Several courts have held that when an objection by one co-defendant inures to the benefit of

---

[4]    The State filed an application for writ of certiorari in each of the defendant's appeals, separately challenging the ICA's memorandum opinions in each.  We accepted both applications and consolidated McKinley's and Bruce's cases for oral argument and disposition on certiorari.

both defendants, the other co-defendant's failure to object or join in the objection does not waive the issue on appeal. In Williams v. United States, defendant Melonee Bryant (Bryant) allegedly helped an undercover police officer purchase crack cocaine from defendant Gualyn Williams (Williams) by using the officer's pre-recorded cash to purchase three bags of crack cocaine; she gave one bag to the officer, and kept two for herself. 966 A.2d 844, 845-46 (D.C. 2009). After Bryant left, the officer performed a field-test on the substance in the bag, which indicated the presence of crack cocaine. Id. Both defendants were later arrested and charged with distributing cocaine to an undercover police officer. Id. at 845-46.

Bryant and Williams were tried together, and the government sought to admit the report of a DEA-7 chemist, which confirmed that the recovered substance was cocaine. Id. at 847. Over Bryant's objection that the report's admission would violate her constitutional right to confrontation, the trial court admitted the report into evidence. Id. Williams did not join Bryant's objection, nor did he raise an objection of his own. See id. On appeal, the government argued that Williams' failure to raise a constitutional objection at trial waived the issue on appeal, thus requiring Williams to show plain error in order for the court to consider it. Id.

20

The D.C. Court of Appeals rejected the government's position.  Id.  The Williams court acknowledged that an objection made by one co-defendant could preserve the issue on appeal for another co-defendant when the objection applies to the latter's situation and inures to his or her benefit.  Id.  Observing that the government did not proffer any evidence to indicate that Williams "was thinking tactically, and was not just asleep at the switches, when Bryant forcefully challenged the admission of the chemist's report without accompanying testimony," the court held that Bryant's objection sufficiently preserved the confrontation issue for Williams' appeal.  Id. at 847-48.  On this point, the court concluded that "[b]ecause the judge was given full opportunity to weigh the constitutional objection, and the prosecution a full chance to argue for admissibility, justice would not be served by holding Williams to near-forfeiture of the claim in circumstances where we see no plausible tactic behind his attorney's silence."  Id. (citation omitted).  See also People v. Griffin, 597 N.W.2d 176, 185 n.4 (Mich. App. 1999) (observing that despite the defendant's failure to object, "because defendant's codefendant raised the objection and the ruling . . . affected both defendants, we here decline to regard the technicality of defendant's lawyer's failing to join in the objection as failing to preserve this issue"), abrogated on other

grounds by People v. Thompson, 730 N.W.2d 708 (Mich. 2007); People v. Wilson, 187 P.3d 1041, 1062-63 (Cal. 2008) (acknowledging that an objection by a co-defendant may sufficiently preserve an issue on appeal for the defendant when the trial court's treatment of the co-defendant's objection would cause the defendant to reasonably believe that making his own objection would be futile); United States v. Garcia, 291 F.3d 127, 140 (2nd Cir. 2002) ("We presume that the objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal.").

By contrast, other courts require a defendant to expressly join a co-defendant's objection, or independently raise his or her own objection, to preserve an issue on appeal. In Jackson v. State, defendants Jackson and Antonio Harris (Harris) were charged with malice murder for shooting and killing a victim while trying to rob her at gunpoint. 532 S.E.2d 674, 676 (Ga. 2000). At trial, the government sought to admit the victim's hospital records, in which Dr. Aru Giorgio (Dr. Giorgio) opined about the trajectory of a bullet that had hit the victim. Id.

While Jackson raised a general objection to the admission of the hospital records into evidence, which Harris joined, neither initially raised a specific ground to support the general objection. Id. After the trial court pointed out that

22

neither Harris nor Jackson had specified the ground upon which they were objecting, Harris stated that he was objecting on the ground that Dr. Giorgio was not qualified as an expert on bullet trajectories. Id. Jackson did not join Harris' objection, nor did he offer his own specific ground for objecting. Id. The trial court overruled Harris' objection and admitted the medical records into evidence. Id.

On appeal, Jackson argued that the trial court should not have admitted the medical records because Dr. Giorgio was not qualified to testify as an expert on bullet trajectories. Id. at 676-77. The Supreme Court of Georgia held that "[t]his argument was not properly raised and preserved below" because "Jackson did not join his co-defendant when his co-defendant offered a reason for objecting to the admission of the medical record." Id. at 677. See also Linnon v. Commonwealth, 752 S.E.2d 822, 828 (Va. 2014) (holding that "one party may not rely on the objection of another party to preserve an argument for appeal without expressly joining in the objection"); Gavlock v. Coleman, 493 N.W.2d 94, 98 (Iowa Ct. App. 1992) (holding that an "issue was not preserved for appeal because defendant failed to make the proper objection or join in the objection raised at trial" by his co-defendant); United States v. Harris, 104 F.3d 1465, 1472 (5th Cir. 1997) ("Having chosen not to object or at least to join his

codefendant's objection, the appellant did not preserve the issue for appeal[.]").

Upon consideration of both possible approaches, we hereby adopt the former approach over the latter for two reasons. First, to require all defendants, especially in cases where numerous defendants are being tried together, to chime in and affirmatively join in a co-defendant's objection, or object individually to the same issue, would impose upon courts a duplicative litany of redundant procedures that would disrupt the flow of the proceedings. Second, justice would not necessarily be served if a criminal defendant were denied the opportunity to raise an issue on appeal due to a mere technical error when the objection raised at trial also affected the defendant's case. "[T]he purpose of requiring a specific objection is to inform the trial court of the error." State v. Long, 98 Hawaiʻi 348, 353, 48 P.3d 595, 600 (2002). When a co-defendant raises an objection, this purpose is served, regardless of whether the other defendant joins the co-defendant's objection or objects independently. Therefore, we hold that an objection by a co-defendant at trial sufficiently preserves the issue on appeal for another defendant tried in the same proceeding when the objection also applies to the non-objecting defendant's case, even if the non-objecting defendant does not join in the co-defendant's

objection or object independently.

Applying this principle to the present case, McKinley objected to the prosecutor's remarks during the State's rebuttal closing argument.  The prosecutor's comments responded to remarks that were made during both defendants' closing arguments. Therefore, McKinley's objection also applied to Bruce's case and inured to Bruce's benefit.  Accordingly, McKinley's objection adequately preserved the issue for Bruce's appeal, and plain error review was not required.

**B.    This court's opinion in State v. Rogan is distinguishable and inapplicable to the present case.**

The State highlights that "[t]he analysis and holding of Rogan, specifically, was based on the use of race in argument."  Accordingly, the State contends that because the comments in the present case did not relate to CW's race, and because the remarks did not similarly inflame the passion and prejudices of the jury as the comment made in Rogan, the ICA erred in relying on Rogan.

In Rogan, the defendant was charged with three counts of sexual assault in the first degree and five counts of sexual assault in the third degree.  91 Hawaiʻi at 409, 984 P.2d at 1235.  The complaining witness, who was twelve years old at the time of the alleged offense, had invited the defendant to her

home while her parents were out of the house. Id. After going to the complaining witness' sister's bedroom to listen to music, the defendant allegedly subjected the complaining witness to various forms of sexual contact and penetration until her mother entered the room after returning home. Id.

During rebuttal closing argument, the prosecutor in Rogan made the following comment:

> There was one thing [that defense counsel mentioned] about, you know, it was the parents who wanted the conviction and somehow she was coached. Yeah, you can bet the parents wanted a conviction. This is every mother's nightmare. Leave your daughter for an hour and a half, and you walk back in, and here's some black, military guy on top of your daughter. That's what she's saying. . . .

Id. at 412, 984 P.2d at 1238 (alterations in original). Defense counsel objected to the comment as an improper appeal to racism, but the trial court overruled the objection. Id.

This court held that the prosecutor's comment was an inflammatory reference to Rogan's race and amounted to a particularly egregious form of misconduct. Id. at 414-15, 984 P.2d at 1240-41. The Rogan court observed that "courts throughout the country have consistently condemned appeals to racial prejudice during closing argument." Id. at 413, 984 P.2d at 1239. Accordingly, this court held that:

> Because there was no dispute as to the identity of the perpetrator in this case, Rogan's race was not a legitimate area of inquiry inasmuch as race was irrelevant to the determination of whether Rogan committed the acts charged. . . . Indeed, the deputy

26

> prosecutor's comment had the potential of distracting the jury from considering only the evidence presented at trial.  It is therefore inescapable that the deputy prosecutor's reference to Rogan as a "black, military guy" was an improper emotional appeal that could foreseeably have inflamed the jury.

Id. at 414, 984 P.2d at 1240.  This court also held that "[t]he deputy prosecutor's inflammatory reference to Rogan's race was further compounded by the statement that the incident was 'every mother's nightmare,' which was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position."  Id.

We agree with the State insofar as we believe that Rogan is distinguishable from this case in two key respects. First, compared to the prosecutor's comments in Rogan, the comments here did not constitute an improper appeal to the jury's emotions that bore no objectively legitimate purpose.  Viewed in context, the prosecutor's comments concluded the State's overarching theme and theory of the case, that Bruce and McKinley had treated CW like a piece of property, by asserting that treating a person in the manner CW had been treated is improper.

Second, unlike the prosecutor's comments in Rogan, the prosecutor's remarks in the present case did not represent an implied invitation to the jury to put themselves in CW's position.  As discussed further in section IV.C, infra, when considered in context, the prosecutor's remarks are more properly

27

viewed as a part of the State's argument that despite defense counsels' assertions in closing argument to the contrary, the evidence sufficiently illustrated that Bruce had facilitated and benefited from CW's prostitution activities, and that McKinley had compelled CW to engage in prostitution against her will.

Because Rogan is significantly distinguishable from the present case, Rogan is inapposite and does not apply. Accordingly, we hold that the ICA erred to the extent that it relied on Rogan in support of its holding.

## C.   The prosecutor's comments did not rise to the level of misconduct.

Having argued that Rogan is inapplicable to the present case, the State contends that State v. Kiakona applies and mandates a different outcome because the State's comments had a legitimate bearing on the central issues in this case. The State also contends that the remarks, considered against the backdrop of the State's closing argument as a whole and the State's theory of the case, did not invite the jury to place themselves in CW's position, or the position of someone near to her, and decide the case based on emotion rather than evidence.

In Kiakona, the defendant was charged with terroristic threatening in the first degree in connection with a road rage incident. 110 Hawaiʻi at 451-52, 134 P.3d at 617-18. The

28

complaining witnesses were two tourists who had, according to the defendant, failed to observe a yield sign and in doing so, cut off the defendant's vehicle.  Id.  One of the complaining witnesses testified that the defendant chased them, tried to run them off the road several times, drove along the side of them, and ran up on their bumper.  Id. at 453-54, 134 P.3d at 619-20.

During closing argument, the prosecutor referred to the complaining witnesses as "tourists" and "haoles" several times.  See id. at 456-57, 134 P.3d at 622-23.  For example, he said:

> That's why [the defendant's] here in court, his own arrogance, his own attitude he says the people in the valley have because it is his turf and these tourists come over there and they cause trouble and they need to be taught a lesson.  That is what this case is about.  He's trying to teach these tourists a lesson.

Id. at 456, 134 P.3d at 622.  On appeal, the defendant argued that the prosecutor committed misconduct in describing the complaining witnesses as "haoles" and "tourists" throughout the State's closing argument.  Id. at 457-59, 134 P.3d at 623-25.

The Kiakona court held that the prosecutor's comments did not constitute an improper appeal to "racial, religious, ethnic, political, economic, or other prejudices of the jurors," nor did they "lack 'a legitimate bearing on some issue in the case, such as identification by race.'"  Id. at 459, 134 P.3d at 625 (quoting State v. Shabazz, 98 Hawaiʻi 358, 376, 48 P.3d 605, 623 (App. 2002)).  The ICA observed that "the central issue at

29

trial was criminal intent--whether Defendant went after [the complaining witnesses] in order to terrorize them or merely followed them in order to settle details the alleged accident entailed." Id. The court also recognized that "references to 'turf,' 'locals' and 'haole tourists' crystallized the motive behind Defendant's criminal intent--his resentment of Caucasian tourists and their supposedly highhanded ways in the place where he was born and raised." Id. Accordingly, the Kiakona court held: "Where, as here, references to status had a fundamental bearing on the central issue in the case, they were not improper." Id.

In the present case, the central issues at trial were whether Bruce had facilitated and profited from CW's involvement in prostitution, and whether McKinley had compelled CW to engage in prostitution against her will. Conflicting evidence was presented on both issues, as discussed in section II.A, supra.

We acknowledge that when viewed in a vacuum, the prosecutor's comments could be interpreted as appealing to the jury's passions and prejudices. However, as in Kiakona, the prosecutor's comments, analyzed in context, had a fundamental bearing on the primary issues in this case: whether Bruce had facilitated and profited from CW's prostitution activities, and whether McKinley had forced CW to involuntarily engage in

prostitution.  During Bruce's closing argument, defense counsel argued that the evidence demonstrated that he was not L-Way, that he never acted as CW's pimp, and that he had never benefited from her activities as a prostitute.  In McKinley's closing argument, defense counsel argued that CW had voluntarily engaged in prostitution, and that McKinley had beaten her because he was exasperated with living with a free-loading roommate that he believed was stealing money from one of his other roommates.

In rebuttal closing argument, the prosecutor responded:

> So this whole thing about [CW] lying and can't be believed, well, the only people who can't be believed was Keshawn Stewart and Mr. Bruce.  <u>The fact of the matter is that they treated her like property.</u>
>
> . . . .
>
> . . . They didn't see her as anything more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force.  That is how they viewed her, and that is how they treated her.  <u>But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly</u>[.]

(Emphases added.)

Considered in context, it appears that the challenged comments were made at the conclusion of the prosecutor's broader argument that the evidence presented at trial amply demonstrated that Bruce and McKinley treated CW like a piece of property--a mere object that they could pass around, control, and use to generate revenue.  Accordingly, the prosecutor's comments summed

31

up the facts that, in the State's view, supported Bruce's and McKinley's charges, and argued that the jury should find both of them guilty despite defense counsels' arguments to the contrary during their closing arguments.  Properly viewed as such, the prosecutor's remarks did not invite the jurors to place themselves in CW's, or any other person's, position, nor did the remarks constitute an improper plea to the jury's passions and prejudices.  Consequently, the prosecutor's comments in this case did not rise to the level of misconduct.

Moreover, while the prosecutor's comments may have cast CW in a sympathetic light, the comments were still not improper because they did not detract from the main point of the otherwise meritorious argument--that the evidence showed that Bruce and McKinley had treated CW like a piece of property.  See State v. Ceballos, 832 A.2d 14, 38 (Conn. 2003) (holding that the prosecutor's comments about a child being the "perfect victim" for abuse due to her difficult childhood and poor living conditions were not improper appeals to the jury's emotions because while the comments cast the complaining witness in "an undoubtedly sympathetic light," they did not detract from the main point of the argument).  At most, in making these comments, the prosecutor argued that as a human being, CW did not deserve to be treated like a piece of property, and that the way Bruce

32

and McKinley treated CW was unacceptable.

We hold that, when considered in context, the prosecutor's comments were relevant to the central issues at trial.  See Kiakona, 110 Hawaiʻi at 459, 134 P.3d at 625.  The comments in the present case did not constitute prosecutorial misconduct.  Accordingly, the ICA erred in holding that the comments were irrelevant to whether Bruce and McKinley were guilty of the offenses with which they were charged, amounted to an invitation for the jurors to decide the case based on their emotions rather than on the evidence presented at trial, and constituted an improper plea to the jurors' passions and prejudices.

## V.  CONCLUSION

For the reasons stated above, as to Bruce, we reverse the ICA's November 17, 2016 judgment on appeal filed pursuant to its October 20, 2016 memorandum opinion, which vacated and remanded the circuit court's judgment of conviction and sentence entered on May 5, 2015.  With respect to McKinley, we reverse the ICA's September 29, 2016 judgment on appeal filed pursuant to its August 31, 2016 memorandum opinion, which vacated and remanded the circuit court's judgment of conviction and sentence and

33

mittimus and warrant of commitment to jail, both of which were

filed on May 5, 2015.

| | |
|---|---|
| Sonja P. McCullen<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Benjamin R.C. Ignacio<br>for respondent<br>Justin McKinley | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Jon N. Ikenaga<br>for respondent<br>Lawrence L. Bruce | /s/ Michael D. Wilson |

